[S. F. No. 12346. In Bank.—May 20, 1927.]

K. TASHIRO, M. D., et al., Petitioners, v. FRANK C. JORDAN, Secretary of State, et al., Respondents.

[1] ALIEN LAND LAW — CONSTRUCTION — OBJECT. — It was undoubtedly the object and purpose of the Alien Land Law of this state to accord to aliens ineligible to citizenship, either individually or as members of a corporation, in which a majority of the members thereof are ineligible to citizenship, the right to acquire and possess real property in this state "in the manner and to the extent and for the purposes prescribed by any treaty," and to deny to such aliens any and all other rights or privileges in or to the real property of this state.

[2] TREATIES—TREATIES BETWEEN THE UNITED STATES AND JAPAN—CONSTRUCTION—RIGHTS UNDER.—By the terms of article I of the Treaty of Commerce and Navigation between the United States and the empire of Japan, proclaimed April 5, 1911 (37 U. S. Stats. at Large, p. 1504), subjects of Japan are accorded the

---

1. See 1 Cal. Jur. 929 and Supplement.

2. Disabilities and property rights of aliens as proper subjects of treaty regulations, notes, A. L. R. 1391; 17 A. L. R. 636.

rights, among others, to carry on trade, lease land for commercial purposes, and "generally to do anything incident to or necessary for trade upon the same terms as native citizens" of this country or state.

[3] ID.—RIGHT TO CARRY ON TRADE—EXTENT OF.—The right "to carry on trade" in the specific lines of business mentioned in the treaty between the United States and Japan, such as conducting manufactories, warehouses and shops, and leasing land for commercial purposes, is from the very terms of said treaty as extensive and complete as that employed by native citizens or subjects.

[4] ID.—RIGHT OF JAPANESE TO FORM CORPORATIONS.—The right of Japanese subjects residing in this state to form a corporation for the purpose of leasing real property upon which to operate and maintain a hospital is within the reasonable intendment of the Treaty of 1911, and such right is therefore not within the prohibition contained in the Alien Land Law of this state, but is expressly recognized by the terms thereof.

[5] ID.—ARTICLE VII OF TREATY OF 1911—CONSTRUCTION.—From a consideration of article VII of the Treaty of 1911 between the United States and Japan, it is evident that the parties to the treaty were not prepared to definitely bind themselves as to the rights of a corporation organized in one country and domiciled therein to transact and carry on business in the other; hence they left the question unaffected by the treaty and subject to be regulated by the respective countries.

[6] ID.—CONSTRUCTION OF TREATY—CLAIMED RIGHT AS NATIVE CITIZEN. There is nothing in the language of the treaty between the United States and Japan to indicate that the words "native citizen" as used in article I thereof, whereby it is sought to confer upon subjects of one country residing within the territory of the other the right generally to do anything incident to˙ or necessary for trade upon the same terms as "native citizens," is employed in any restrictive sense; on the contrary, it is plainly obvious from the terms of the treaty that the intent of the parties thereto was to extend to foreign subjects all such rights that the native citizen enjoyed irrespective of their source.

(1) 2 **C. J.**, p. 1048, n. 57, p. 1050, n. 65.    (2) 2 **C. J.**, p. 1050, n. 65; 38 Cyc., p. 970, n. 18, p. 971, n. 19.    (3) 2 **C. J.**, p. 1046, n. 34. (4) 2 **C. J.**, p. 1050, n. 65.    (5) 38 Cyc., p. 971, n. 22.    (6) 11 **C. J.**, p. 776, n. 41, p. 777, n. 44; 38 Cyc., p. 970, n. 10.

APPLICATION for a Writ of Mandate to compel the Secretary of State to file certain articles of incorporation. Writ granted.

The facts are stated in the opinion of the court.

J. Marion Wright for Petitioners.

U. S. Webb, Attorney-General, and Robert W. Harrison, Chief Deputy Attorney-General, for Respondents.

CURTIS, J.—This is an application for a writ of mandate to compel the respondents, as Secretary of State and Deputy Secretary of State, respectively, to file certain articles of incorporation prepared and executed by petitioners and presented by them to respondents as such officers, for the purpose of filing in the office of Secretary of State. The application also asks that the respondents be compelled to issue a certificate of incorporation and to certify and deliver to petitioners three copies of said articles of incorporation. It appears from said application that petitioners are residents of the state of California and county of Los Angeles, and are all Japanese subjects ineligible to become citizens of the United States or state of California; that they have voluntarily associated themselves together for the purpose of forming a corporation under the laws of the state of California to be known as the Japanese Hospital of Los Angeles; and that among the purposes for which this corporation is sought to be organized are those of maintaining a general hospital, to purchase the necessary equipment for the same and to lease land upon which the buildings necessary for the maintenance of said hospital may be erected. Respondents refuse to file these articles of incorporation or to take any official action thereon for the reason, as contended by them, that the treaty between this government and the Japanese government confers no right upon Japanese subjects residing in this country to form a corporation under the laws of this or of any other state of this country. Without this right is given to petitioners by the terms of said treaty, the respondents contend, petitioners are prohibited by the laws of this state, and particularly by the provisions of the Alien Land Law, from forming any corporation, one of the purposes of which is to possess, use, or occupy real property situated in this state.

Section 1 of the Alien Land Law, as adopted by the electors of this state in 1920 and thereafter amended by the act of the legislature approved June 20, 1923 (Stats. 1923, p. 1020), deals with the rights of aliens eligible to citizenship and in no way relates to any matter involved in the present proceeding. Sections 2 and 3 of this act are as follows:

"Sec. 2. All aliens other than those mentioned in section one of this act may acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the manner and to the extent, and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise.

"Sec. 3. Any company, association or corporation organized under the laws of this or any other state or nation, of which a majority of the members are aliens other than those specified in section one of this act, or in which a majority of the issued capital stock is owned by such aliens, may acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the manner and to the extent and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such members or stockholders are citizens or subjects, and not otherwise. Hereafter all aliens other than those specified in section one hereof may become members of or acquire shares of stock in any company, association or corporation that is or may be authorized to acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state, in the manner and to the extent and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise."

[1] It will be observed from a reading of the foregoing sections of the Alien Land Law that by the provisions of section 2 thereof the rights of aliens ineligible to citizenship to possess, use, or occupy real property in this state

are limited to such rights as are prescribed by the treaty between the country of which said aliens are subjects and this country. By section 3 of said act the rights of any corporation organized in this or any other state, of which a majority of the members thereof are aliens ineligible to citizenship, to possess, use, or occupy real property situated in this state are likewise limited and governed by the terms of the treaty existing between this government and the government of which such aliens are citizens or subjects. In other words, it was undoubtedly the object and purpose of the Alien Land Law of this state to accord to aliens ineligible to citizenship, either individually or as members of a corporation, in which a majority of the members thereof are ineligible to citizenship, the right to acquire and possess real property in this state "in the manner and to the extent and for the purposes prescribed by any treaty," and to deny to such aliens any and all other rights or privileges in or to the real property of this state. It is apparent, therefore, that the measure of petitioners' rights as asserted in this proceeding is to be determined by the terms and provisions of the treaty or treaties now in force between this government and the empire of Japan. Article I of the Treaty of Commerce and Navigation between this government and the empire of Japan, proclaimed April 5, 1911 (37 U. S. Stats. at Large, p. 1504), in so far as it is material to any question arising herein, provides that:

"The citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established."

[2] It will be observed that by the terms of this article of said treaty, subjects of Japan are accorded the right, among others, to carry on trade, to lease land for commercial purposes, and "generally to do anything incident to or necessary for trade upon the same terms as native citi-

zens'' of this country or state. In the case of *State of
California* v. *Tagami,* 195 Cal. 522 [234 Pac. 102], it was
held that a lease of land to a subject of Japan, for the
purpose of using and occupying the same as a health resort
or sanatorium is for a "commercial purpose" within the
terms of said treaty. It is not seriously contended by re-
spondents that the use of land for the purpose of erecting
and maintaining thereon a hospital is not a use for com-
mercial purposes as the term is used in said treaty, nor is
it contended that a subject of Japan or any number of
them, either in their capacity as individuals or as members
of a partnership, cannot under the terms of said treaty
lease real property in this state for the purpose of main-
taining thereon a hospital. The sole claim of respondents
is that the treaty does not expressly or by reasonable infer-
ence confer upon Japanese subjects residing in this state
the right to form a corporation, if one of the purposes
thereof is to lease for commercial purposes real property
situated in this state.

In the case of *California* v. *Tagami, supra,* this court
quoted with approval from the following language from
the case of *De Geofroy* v. *Riggs,* 133 U. S. 258 [33 L. Ed.
642, 10 Sup. Ct. Rep. 295, see, also, Rose's U. S. Notes]:
"It is a general principle of construction, with respect to
treaties, that they shall be liberally construed, so as to
carry out the apparent intention of the parties to secure
equality and reciprocity between them. As they are con-
tracts between independent nations, in their construction,
words are to be taken in their ordinary meaning, as under-
stood in the public law of nations, and not in any artifi-
cial or special sense impressed upon them by local law,
unless such restricted sense is clearly intended. And it
has been held by this court that where a treaty admits of
two constructions, one restrictive of rights that may be
claimed under it, and the other favorable to them, the lat-
ter is to be preferred." The principle thus enunciated
appears to be accepted by the courts generally, and in 38
Ency. of Law and Procedure (Cyc.), 970, it is stated as
follows: "Treaties should ordinarily be construed liberally,
and so where the treaty admits of two constructions, one
restrictive as to the rights that may be claimed under it
and the other liberal, the latter is to be preferred." In

support of this text the following authorities are cited: *In re Wyman,* 191 Mass. 276 [114 Am. St. Rep. 601, 77 N. E. 379] , *In re Stixrud's Estate,* 58 Wash. 339 [Ann. Cas. 1912A, 850, 33 L. R. A. (N. S.) 632, 109 Pac. 343] , *Disconto Gesellschaft* v. *Umbreit,* 208 U. S. 570 [52 L. Ed. 625, 28 Sup. Ct. Rep. 337, see, also, Rose's U. S. Notes] , *Scharpf* v. *Schmidt,* 172 Ill. 255 [50 N. E. 182] , *Adams* v. *Akerlund,* 168 Ill. 632 [48 N. E. 454], and *De Geofroy* v. *Riggs,* 133 U. S. 258 [33 L. Ed. 642, 10 Sup. Ct. Rep. 295].

As we have already seen, section 1 of the Treaty of 1911 provides that subjects of Japan residing in this state shall have the right to carry on trade, wholesale and retail, to lease land for commercial purposes and generally do anything incident to or necessary for trade upon the same terms as native citizens or subjects. It is apparent from the reading of this section of the treaty that it was the intention of the high contracting parties thereto to give to the subjects of either country residing in the territory of the other the right to carry on trade therein upon the same terms as native subjects or citizens of the latter country. Yet this right to carry on trade is limited to such subjects and purposes as are enumerated in the treaty itself. Subjects of Japan residing in this country and subjects of our own country residing in Japan have only such rights in the country of their domicile as are expressly or by reasonable implication given to them by the treaty. The right to possess real property for agricultural purposes is not mentioned or referred to in the treaty. In fact, the treaty is silent upon this subject. Accordingly, it has been held that no right to possess real property for agricultural purposes is given to subjects of Japan residing in this country and, therefore, a statute prohibiting Japanese subjects residing in this state from possessing real property for agricultural purposes is valid and constitutional (*Porterfield* v. *Webb,* 195 Cal. 71 [231 Pac. 554]; *Porterfield* v. *Webb,* 263 U. S. 225 [68 L. Ed. 278, 44 Sup. Ct. Rep. 21]; *Webb* v. *O'Brien,* 263 U. S. 313 [68 L. Ed. 318, 44 Sup. Ct. Rep. 112]). It was further held that the right "to carry on trade" given by the treaty does not give to Japanese subjects residing in this state the privilege of acquiring stock in a corporation owning farm or agricultural land situated in this state (*Frick* v. *Webb,* 263 U. S. 326 [68 L. Ed. 323, 44 Sup. Ct. Rep. 115]). In this case the

court said: "The provisions of the act (Alien Land Law of California) were framed and intended for general application and to limit the privileges of all ineligible aliens in respect of agricultural lands to those prescribed by treaty between the United States and the nation or country of which such alien is a citizen or subject. The State has power, and the act evidences its purposes, to deny to ineligible aliens permission to own, lease, use or have the benefit of lands within its borders for agricultural purposes. . . . It may forbid indirect as well as direct ownership and control of agricultural land by ineligible aliens. The right 'to carry on trade' given by the treaty does not give the privilege to acquire the stock above described. To read the treaty to permit ineligible aliens to acquire such stock would be inconsistent with the intention and purpose of the parties."

[3] But the right "to carry on trade" in the specific lines of business mentioned in the treaty, such as conducting manufactories, warehouses, and shops and leasing land for commercial purposes, is from the very terms of said treaty as extensive and complete as that employed by native citizens or subjects. It would be difficult to frame language much more comprehensive than that found in the following provision of article I of the treaty—"and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects." This language follows the provision enumerating the different classes of trade or business in which resident aliens are authorized to engage and must be read in connection with such provision, and as so read it gives to such aliens an equal standing with native citizens or subjects in the conduct of those enumerated classes of business which may be carried on by such aliens.

[4] If, then, Japanese subjects residing in this state are authorized to engage in certain lines of business, including that of leasing real property for commercial purposes, and under the terms of the treaty they are further authorized to do anything incident or necessary in the conduct of such business upon the same terms as native citizens or subjects, are they thereby empowered to form a corporation as one of the necessary incidents of transacting such business? The statutes of this state provide the terms under which native citizens of this country may enter into corporate

relations, and it is not questioned by respondents that petitioners have complied with the requirements of all such statutes, provided they are eligible to form a corporation under the terms of the treaty. It is hardly necessary to call attention to the extent to which corporations are formed and used by the citizens of this state, as well as by those of all other civilized countries, in the transaction of the various lines of trade carried on therein. There is scarcely a class of business of any consequence carried on in this state in which corporate interests do not play, if not a leading, at least an important part in its transaction. The extensive and widespread use of this means of carrying on trade or transacting business is convincing proof of the advantages to be derived therefrom. Why, then, should this method of carrying on trade as to the classes of business enumerated in the treaty be denied subjects of Japan residing in this state in the face of the plain provisions of the treaty conferring upon them as to such classes of business the right to do anything incident to such business upon the same terms as native citizens? A corporation, or the members thereof, in conducting any certain business do not thereby exercise any more extensive or different right or control over the property of said business than they would exercise over said property if they carried on the business as individuals. Should the petitioners as individuals decide to lease land and erect thereon and equip a hospital and maintain and operate the same, they could do so in the same manner and to the same extent as a corporation organized by them might do the same identical acts. As a corporation they would not be authorized to exercise any right over property which they do not now possess as individuals nor to transact any business nor engage in any line of trade which they could not transact or engage in as individuals. The corporation is simply the instrumentality through which the members thereof engage to carry on the business in which they have a common interest. It is simply incidental to the business just as an agreement of copartnership would be if a partnership were formed to perform the same acts. In view of these considerations, and mindful of the rule already referred to, requiring courts to give to treaties a liberal construction, we are of the opinion that the right of Japanese subjects residing in this state to form

a corporation for the purpose of leasing real property upon which to operate and maintain a hospital is within the reasonable intendment of the Treaty of 1911. Such right is therefore not within the prohibitions contained in the Alien Land Law of this state, but is expressly recognized by the terms thereof.

[5] Respondents have directed our attention to the provisions of article VII of the Treaty of 1911, which was designed to confer certain rights upon corporations (therein referred to as limited-liability companies or associations) "organized in accordance with the laws of either High Contracting Party and domiciled in the territories of such Party." Following the granting of such rights said section of the treaty provides that: "The foregoing stipulation has no bearing upon the question whether a company or association organized in one of the two countries will or will not be permitted to transact its business or industry in the other, this permission remaining always subject to the laws and regulations enacted or established in the respective countries or in any part thereof." It is insisted by respondents that this provision argues most strongly against petitioners' contention in that it evinces no desire on the part of either party to the treaty of securing freedom of action in the territories of the other for corporations of its own creation. Therefore, say respondents, "How much less must it have been concerned in the creation by that other of corporations which were to act in this country of their creation?" We are not able to perceive the force of respondents' argument. The parties to the treaty evidently were not prepared to definitely bind themselves as to the rights of a corporation organized in one country and domiciled therein to transact and carry on business in the other. Hence, they left the question unaffected by the treaty and subject to be regu- lated by the respective countries. They were, however, pre- pared to definitely fix and determine the rights of citizens and subjects of one country domiciled in the other, and to this end they set forth these rights distinctly and comprehen- sively in article I of the Treaty, the terms of which we have already considered and attempted to construe. Article XI of the Treaty also refers to corporations, but clearly this reference has no bearing upon the question to be con- sidered in this proceeding.

[6] Finally, respondents contend that the words "native citizens" as used in the treaty in article I thereof, whereby it is sought to confer upon subjects of one country residing within the territory of the other the right "generally to do anything incident to or necessary for trade upon the same terms as native citizens," are employed in a restrictive sense, and that this provision of the treaty deals only with native citizens and subjects of the United States and their privileges and immunities as such and not with the privileges and immunities of the citizens and subjects of the several states. That there is a citizenship of the United States and a citizenship of a state, and the privileges and immunities of one are not the same as the other is well established by the decisions of the courts of this country. The leading cases upon the subjects are those decided by the supreme court of the United States and reported in 16 Wall. 36, and known as the Slaughter-House cases. However, to adopt the construction of the words "native citizens," as contended for by respondents, would be contrary not only to the spirit but to the express language of the rule applicable to the interpretation of treaties which we have already considered. We refer to the rule quoted with approval by this court in *State of California* v. *Tagami, supra,* and particularly to the following portion thereof: "words (of a treaty) are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law, unless such restricted sense is clearly intended." There is nothing in the language of the treaty to indicate that the words "native citizens" used therein were employed in any restricted sense. On the other hand, we think it is plainly obvious from the terms of the treaty that the intent of the parties thereto in conferring upon the subjects of one country residing in the other the right to exercise certain privileges "upon the same terms as native citizens" was to extend to such foreign subjects all the rights that the native citizen enjoyed irrespective of the source of such rights.

It may be that the right to form a corporation such as that which petitioners desire to organize is governed by the local laws of each particular state, and that such right may not be conferred upon alien residents in this state, or, for that matter, upon any class of persons whatsoever, by treaty

or by any other act of the federal government. If this is so, then the state might disregard the treaty or any statute enacted by Congress which would infringe upon its exclusive jurisdiction in this particular and enact such laws in that regard as may meet the approval of the legislature or of the people of the state, irrespective of any treaty or federal statute. But in the enactment of the Alien Land Law the state of California has not attempted to run counter to the Treaty of 1911, or to any other treaty between this country and a foreign country. On the other hand, the provisions thereof relative to the right of aliens ineligible to citizenship to acquire and possess real property in this state expressly recognize such acquisition and possession "in the manner and to the extent and for the purpose prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject." The provision found in section 3 of said act relative to corporations, a majority of whom are aliens not eligible to citizenship, acquiring or possessing real property in this state, contains a like reference to and recognition of the terms of any treaty between this government and any foreign nation. The fact, therefore, that the right to provide for and control the organization of corporations in this state may be within the exclusive jurisdiction of the state and not the national government is not decisive of any question arising in this proceeding for the reason that the action taken by the state in reference to such matters by the enactment of the Alien Land Law expressly limits the terms and provisions of said law to such rights as are not prescribed by any treaty.

Let the writ issue as prayed for.

Langdon, J., Richards, J., Seawell, J., Preston, J., and Waste, C. J., concurred.