[L. A. No. 7881. In Bank.—February 27, 1925.]

## THE STATE OF CALIFORNIA, Appellant, v. TOJUERO TAGAMI et al., Respondents.

[1] Treaties — Construction — Rule.—In interpreting a particular provision of a treaty, the language and scope of the entire instrument is to be considered, and it is a principle of interpretation of treaties between the United States government and other friendly powers that they are, as a general rule, to be liberally construed.

[2] Id.—"Trade" and "Commerce"—Definitions.—The words "trade" and "commerce," frequently found in conjunction or juxaposition in treaties between nations, when so employed are held to impart to each other an enlarged signification which would include practically every business occupation carried on for the purpose of procuring subsistence or profit and into which, or any material part of which, the elements of bargain and sale, barter, exchange, or traffic enter.

[3] Id.—"Commerce" and "Commercial" — Definitions. — Of these phrases, the terms "commerce" and "commercial" are usually given the larger signification as embracing those dealings in general which arise and are conducted in the course of business and social intercourse between individuals and peoples.

[4] Id. — Lease of Land to Alien Ineligible to Citizenship — Validity of—Construction of Treaty With Japan.—A lease of land to a native and subject of the Empire of Japan, who is an alien ineligible to citizenship under the laws of the United States, for the sole purpose of using and occupying the same as a health resort and sanitarium, is for such a "commercial" purpose as comes fairly within the intendment of the existing treaty between the United States and Japan and does not violate the act of 1913 (Stats. 1913, p. 206.)

(1) 38 Cyc., p. 970, n. 18.    (2) 38 Cyc., p. 971, n. 25.    (3) 12 C. J., p. 6, n. 6.    (4) 2 C. J., p. 1056, n. 14.

APPEAL from a judgment of the Superior Court of Los Angeles County. Leslie R. Hewitt, Judge. Affirmed.

The facts are stated in the opinion of the court.

1. See 26 R. C. L. 926.

U. S. Webb, Attorney-General, Frank English, Deputy Attorney-General, Asa Keyes, District Attorney, and Tracy C. Becker, Deputy District Attorney, for Appellant.

Albert H. Elliott, Clyde W. Smith and J. Marion Wright for Respondents.

RICHARDS, J.—This appeal is prosecuted by the State of California as plaintiff from a judgment in favor of the defendants after an order sustaining their demurrer to the complaint, the plaintiff declining to amend. The action is one instituted by the state at the instance of the attorney-general, seeking to have an escheat declared and enforced as to a certain leasehold interest in certain lands and premises described in its said complaint. The basic facts upon which the action is predicated, as averred in the complaint, are these. On and prior to the first day of September, 1918, the defendant, Ramon D. Sepulveda, was the owner in fee and in possession of a parcel of land at a place along the coast of southern California known as "Fish Camp," lying adjacent to the line of ordinary high tide, being two hundred feet long by ninety-eight feet wide, and consisting in area of something less than half an acre of land. On said last-mentioned date Sepulveda executed a lease in writing of said tract of land to his codefendant Tagami for the term of three years, with certain options for additional periods not exceeding nine years, and for the express purpose of having said land occupied and improved by said lessee for use as a health resort and sanitarium. The complaint proceeds to allege that under and in pursuance of said lease Tagami entered into possession of said lands and premises and has since used and is now using and occupying the same for the purpose of a health resort and sanitarium and for no other use or purpose; that said Tagami was and is an alien, a native and subject of the Empire of Japan, and as such ineligible to citizenship under the laws of the United States; that by virtue of the foregoing facts the leasehold interest of Tagami is being held by him in violation of the laws of California and particularly of the statute of 1913 relating to the disability of certain aliens, and to escheats, and of the acts amendatory thereof; and that in consequence thereof said leasehold interest has escheated to the State of Cali-

fornia. Wherefore the plaintiff prays for a decree establishing such escheat of said leasehold interest in said land, determining the value thereof, and decreeing that the same be sold in conformity with the provisions of section 1271 of the Code of Civil Procedure, and for general relief. The trial court sustained the demurrer of the defendants to the complaint upon the ground that the same did not state a cause of action, and thereafter entered its judgment in the defendants' favor, from which judgment this appeal has been taken.

It is the appellant's contention that an escheat of said leasehold interest exists by virtue of the facts averred in its complaint as above set forth. It is obvious that such escheat if the same has occurred, has not arisen or been created through any violation of those provisions of the so-called "alien land laws" of California which forbid the acquiring, leasing, or use of lands in the State of California for agricultural purposes, and which declare escheats and other penalties for the acquisition, possession or use by ineligible aliens of such lands. The complaint herein expressly avers that the lands held by Tagami under and by virtue of said lease are being held, possessed, and used by him solely for the uses and purposes of a health resort and sanitarium, and it follows that if an escheat has thereby been created it must have come into being by virtue of other inhibitions in the statutes of California than those affecting agricultural lands. The appellant contends that such escheat has come into being by virtue of the provisions of the statute of 1913, which is entitled: "An Act relating to the rights of aliens, etc., with respect to property in this state, providing for escheats in certain cases, prescribing the procedure therein and repealing all acts or parts of acts inconsistent or in conflict therewith." (Stats. 1913, p. 206.) Sections 1 and 2 of said act provide as follows:

"Section 1. All aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, transmit and inherit real property, or any interest therein, in this state, in the same manner and to the same extent as citizens of the United States, except as otherwise provided by the laws of this state.

"Section 2. All aliens other than those mentioned in section one of this act may acquire, possess, enjoy and transfer

real property, or any interest therein, in this state, in the manner and to the extent and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise, and may in addition thereto lease lands in this state for agricultural purposes for a term not exceeding three years.''

Section 6 of the act provides:

''Section 6.   Any leasehold or other interest in real property less than the fee, hereafter acquired in violation of the provisions of this act by any alien mentioned in section two of this act, or by any company, association or corporation mentioned in section three of this act, shall escheat to the state of California.   The attorney-general shall institute proceedings to have such escheat adjudged and enforced as provided in section five of this act.   In such proceedings the court shall determine and adjudge the value of such leasehold, or other interest in such real property, and enter judgment for the state for the amount thereof together with costs.   Thereupon the court shall order a sale of the real property covered by such leasehold, or other interest, in the manner provided by section 1271 of the Code of Civil Procedure.   Out of the proceeds arising from such sale, the amount of the judgment rendered for the state shall be paid into the state treasury and the balance shall be deposited with and distributed by the court in accordance with the interest of the parties therein.''

It will be seen from a reading of the foregoing provisions of said statute that by the terms of section 2 aliens ineligible to citizenship under the laws of the United States may nevertheless acquire, possess, enjoy, and transfer real property or any interest therein in this state in the manner and to the extent and for the purposes prescribed in whatever treaty exists between the government of the United States and the nation or country of which such alien is a citizen or subject, with the added proviso as it stood in said statute at the date of its adoption, that such ineligible alien might in addition thereto lease lands for agricultural purposes for a term not exceeding three years.   By its later legislation, and particularly by the initiative measure adopted by the people of California at the general election held in November, 1920 (Stats. 1921, p. lxxxiii), and amended by the act of

the legislature in 1923 (Stats. 1923, p. 1020), the permission above granted to ineligible aliens to hold leases of agricultural lands for a period not exceeding three years was withdrawn, but otherwise the provisions of sections 2 and 6 of the statute of 1913 remain unchanged so far as the issues involved in the instant case are concerned. It follows that if any escheat of the leasehold interest acquired and held by the defendant Tagami in the lands in question has arisen it could only have occurred by virtue of a violation on his part of the provisions, permissions, and limitations of whatever treaty was in existence at the time of his entering into said lease or at any time thereafter and during his occupation of said premises thereunder and for the uses and purposes specified therein. This much the appellant practically concedes by basing its argument of this appeal upon the proposition that the particular leasehold involved in this proceeding was not such a lease of land as was or is embraced within the provisions and permissions of the treaty between the government of the United States and the Empire of Japan entered into in the year 1911 (37 Stat. 1504), and which has ever since been and still is in full force and effect. It is the contention of the appellant that under the provisions of article I of said treaty the citizens and subjects of each of the high contracting parties thereto are granted liberty and permission to enter the territory of the other for certain limited purposes as set forth therein; that among these is the grant of liberty and permission to lease lands for "residential and commercial purposes" only; and that the leasehold under consideration in the instant proceeding is not one which may be brought within either of the foregoing purposes for which leases by aliens in the respective countries of either of the contracting powers may be-entered into. The precise provisions of the first paragraph of said article I of the treaty read as follows:

"The citizens or subjects of each of the high contracting parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally do anything incident to or necessary for trade upon

the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established.''

[1]   In determining the interpretation to be given to this provision of the treaty the language and scope of the entire document is, of course, to be considered, and at the outset of such consideration those certain principles which have been with a fair degree of uniformity applied, at least by our own government, to the interpretation of treaties between ourselves and other friendly powers are of first importance.   Among these is the doctrine that treaties entered into between friendly powers are, as a general rule, to be given a liberal interpretation.   This principle was given apt expression by Mr. Justice Field in the case of *De Geofroy* v. *Riggs,* 133 U. S. 258 [33 L. Ed. 642, 10 Sup. Ct. Rep. 295, see, also, Rose's U. S. Notes], wherein that learned justice says:

"It is a general principle of construction, with respect to treaties, that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them.   As they are contracts between independent nations, in their construction, words are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law, unless such restricted sense is clearly intended.   And it has been held by this court that where a treaty admits of two constructions, one restrictive of rights that may be claimed under it, and the other favorable to them, the latter is to be preferred.''

Looking to the treaty here under consideration, taken as a whole, it will be observed that its opening paragraphs expressly declare that it is to be a treaty between friendly powers, entered into with the mutual desire and purpose of strengthening "the relations of amity and good understanding which happily exists between the two nations,'' and having for its object, "The fixation in a manner clear and positive of the rules which are hereafter to govern the commercial intercourse between their respective countries.''   The treaty is termed "A treaty of commerce and navigation'' for the foregoing purposes.   Its first article provides that:

"The citizens or subjects of each of the high contracting parties shall receive, in the territories of the other, the most

constant protection and security for their persons and property, and shall enjoy in this respect the same rights and privileges as are or may be granted to native citizens or subjects, on their submitting themselves to the conditions imposed upon the native citizens or subjects.''

In certain other clauses of said treaty the citizens or subjects of the respective contracting powers are to enjoy as to particular rights and privileges the equality accorded to native citizens or subjects and to occupy the status of those of ''the most favored nation.'' It would seem to be obvious that to such a treaty the foregoing principle as to liberality in its interpretation with a view to achieving its expressed purposes as above outlined should be adopted and applied. The opening sentence of the first article of the treaty as above quoted provides that, ''The citizens or subjects of each of the high contracting parties shall have the same liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail.'' In order that the foregoing liberties and privileges may be exercised the citizens or subjects of the respective parties to the treaty are by the succeeding clause in said section accorded the right ''to own or lease and occupy houses, manufactories, warehouses and shops''; and are also permitted ''to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade.'' The question in this case turns upon the meaning to be given to the term ''commercial purposes'' as used in the foregoing clause of article I of said treaty. Looking to its immediate context in said article, this phrase would seem to be intimately linked up with the term ''trade,'' as twice employed in said article in defining the liberties and activities of those persons, the citizens or subjects of each of the contracting parties, for whose benefit the treaty was made. [2] The words ''trade'' and ''commerce'' are frequently found in conjunction or juxtaposition in treaties between nations and in those constitutions and laws which define and regulate the scope and purposes of such international engagements. They are also often employed by lexicographers in defining each other. When so employed, and particularly when so used in the conjunctive, they are held to impart to each other an enlarged signification which would include practically every business occupation carried on for the purpose

of procuring subsistence or profit and into which, or any material part of which, the elements of bargain and sale, barter, exchange or traffic enter. Each of these terms has sometimes been subjected to two limitations which would distinguish them from unskilled labor and even from agricultural employments on the one hand and from professional employments and the exercise of the fine arts on the other. (See Standard Dictionary, "Trade.") [3] Of these two phrases the terms "commerce" and "commercial" are usually given the larger signification as embracing those dealings in general which arise and are conducted in the course of business and social intercourse between individuals and peoples. (See Standard Dictionary, "Commerce.") This enlarged signification was early in our national history imparted to the term "commerce" by Chief Justice Marshall, in the leading case of *Gibbons* v. *Ogden,* 9 Wheat. (U. S.) 1 [6 L. Ed. 23, see, also, Rose's U. S. Notes], when, in defining the term as employed in our federal constitution, he said: "Commerce undoubtedly is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches and is regulated by prescribing rules for carrying on that intercourse." This enlarged meaning of the term "commerce" has been adopted and carried down through a long line of later decisions of both federal and state tribunals and has been applied to many and varied occupations. In the case of *Welton* v. *Missouri,* 91 U. S. 280 [23 L. Ed. 347, see, also, Rose's U. S. Notes], the supreme court said: "Commerce is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale and exchange of commodities between the citizens of our country and the citizens or subjects of foreign countries and between the citizens of different states." In the case of *Preston* v. *Finley,* 72 Fed. 850, it was held that within the comprehensive definition of the term "commerce" given by the supreme court in the foregoing cases, a newspaper was the subject of commercial intercourse and sale between state and state like any other article in which the right of traffic exists. In the case of *In re Radke Co.,* 193 Fed. 735, it was decided that the term "commercial corporation" as used in the National Bankruptcy Act in-

cluded a corporation which, owning its own property, was engaged in leasing it and collecting rents therefor. ''It was transacting business,'' says the court. In the quite recent case of *Asakura* v. *City of Seattle*, 265 U. S. 332 [68 L. Ed. 1041, 44 Sup. Ct. Rep. 515], it was decided that a Japanese alien engaged in the business of a pawnbroker was engaged in ''trade'' within the language of article I of the treaty under review. In so deciding Mr. Justice Butler said: ''Treaties are to be construed in a broad and liberal spirit, and, when two constructions are ·possible, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred. *Hauenstein* v. *Lynham*, 100 U. S. 483, 487 [25 L. Ed. 628]; *De Geofroy* v. *Riggs*, 133 U. S. 271 [33 L. Ed. 642, 10 Sup. Ct. Rep. 295]; *Tucker* v. *Alexandroff*, 183 U. S. 424, 437 [46 L. Ed. 264, 22 Sup. Ct. Rep. 195, see, also, Rose's U. S. Notes]. The ordinance defines 'pawnbroker' to 'mean and include every person whose business or occupation it is to take and receive by way of pledge, pawn or exchange, goods, wares or merchandise, or any kind of personal property whatever, for the repayment or security of any money loaned thereon, or to loan money on deposit of personal property,' and defines 'pawnshop' to 'mean and include every place at which the business of pawnbroker is carried on.' The language of the treaty is comprehensive. The phrase 'to carry on trade' is broad. That it is not to be given a restricted meaning is plain. The clauses 'to . . . own or lease . . . shops, . . . to lease land . . . for . . . commercial purposes, and generally to do anything incident to or necessary for trade' and 'shall receive . . . the most constant protection and security of their . . . property, . . . ' all go to show the intention of the parties that the citizens or subjects of either shall have liberty in the territory of the other to engage in all kinds and classes of business that are or reasonably may be embraced within the meaning of the word 'trade' as used in the treaty.''

[4] In the light of the foregoing views as to the enlarged and liberal interpretation to be given to the words ''trade,'' ''commerce,'' and ''commercial'' as employed in the terms of the treaty under consideration, we approach the immediate question as to whether the expressed purpose for which the lease in question here was entered into and the lease-

hold interest in the lands and premises described therein acquired by the respondent Tagami was such a ''commercial'' purpose as to come fairly within the intendment of the treaty makers in the use of said terms. The expressed purpose for which said respondent took said lease and admittedly proceeded to operate thereunder was that of conducting a ''health resort and sanitarium.'' It is a matter of common knowledge that health resorts and sanitariums have been and are being established and operated in various parts of the state of California, wherever climatic and other conditions are or are supposed to be favorable, and that these establishments are usually, if not universally, conducted for profit. It is also a matter of common knowledge that the conduct of such institutions involve business transactions, including the equipment and supplying of the institution with the varied and often extensive accessories to its successful operation and the continuing purchase of merchandise and other articles of daily consumption essential to its upkeep. That the establishment and proper conduct of such institutions as aids to public health should be encouraged is beyond question; and that persons of alien extraction, even though ineligible to citizenship under our laws, should be permitted to establish and maintain them in the interest of the health, cleanliness, and comfort even of their own alien race should be equally beyond controversy. No nice distinction can or should be drawn between a business venture of this character and the many others in which aliens of this particular race, as a matter of common knowledge, are and for many past years have been engaged in the state of California, such as the keeping of hotels, lodging-houses, tea-houses, and eating places of various sorts, the conduct of drugstores, bath-houses, barber-shops, book-stores, theaters, and other places of amusement or recreation. Most, if not all, of these activities are in more or less modified form either necessary or incidental to the conduct of health resorts. To distinguish between a health resort and sanitarium conducted for profit and any or all of these forms of business or commercial activity would be to create a rule of exclusion which would be practically without limit and to shut aliens of this race out of most, if not all, of the many and varied occupations in which they have heretofore preferred or been permitted to engage, and would not only

have this effect but would by necessary reaction and sequence foreclose the citizens of our own country from engaging in like pursuits within the Empire of Japan.

The appellant herein, in support of the interpretation it would have us place upon the foregoing clause of this treaty, makes the further contention that in interpreting the treaty in the form in which it has been phrased since its execution in 1911, we should consider those matters of public and official history which preceded and attended the adoption of the treaty in its present form as disclosing an intention on the part of the framers of the treaty to impart to it a restricted meaning which would exclude the sort of occupation or business for which the leasehold here in question was to be utilized. Our attention is directed to the fact that the circuit court of the United States, in the case of *Terrace* v. *Thompson,* 263 U. S. 197 [68 L. Ed. 255, 44 Sup. Ct. Rep. 15], recites that in the draft of the treaty presented by the imperial government of Japan,. the article therein corresponding to article I of the present treaty contained a clause permitting the citizens or subjects of each of the contracting powers ''to lease land for residential, commercial, industrial, manufacturing and other lawful purposes,'' and that in the ensuing correspondence between the then Secretary of State and the representative of the imperial government objection was made to the use of the phrases ''industrial and other lawful purposes'' and that as a consequence these phrases were eliminated from the final and adopted draft of said treaty, and it was executed and approved in its present form. The appellant herein deduces from this recital by said court of the foregoing undoubted facts attending the formation and final adoption of the treaty, the conclusion that the more restricted meaning for which it is contending should be given to the words which were permitted to remain therein. But we do not find such a conclusion deducible either from the correspondence between the representatives of the respective powers proposing to enter into treaty relations, nor from the language of said circuit court in reciting and interpreting the same, since it clearly appears from such correspondence, as pointed out in said case, that the sole object in view on the part of the representative of our government in suggesting the omission of the objectionable phrases was that of eliminating from

the draft of said treaty a phrasing which might be held to go beyond the desire of our nation to prevent the leasing to said aliens of agricultural lands, and that this was due to the then existing condition of the California statute inhibiting the leasing of lands for agricultural purposes for a term in excess of three years. It would not be going beyond the boundaries of well-known public history to recall the fact that there was at that very time a growing agitation in California looking toward the adoption of the statute which was in fact enacted in 1913 and to its later enlargement by the terms of which the leasing of lands to alien Japanese for agricultural purposes was altogether inhibited. If it had been the intention of the framers of said treaty to create a more drastic inhibition against the leasing of lands by aliens of this race than that which is referred to in their correspondence and embraced within the terms of said treaty, it would have been a simple matter to have done so. If, as the appellant insists, the proper interpretation of the express terms of said treaty would render it susceptible of the restrictive meaning which it would have us assign to it, there would have been no impediment in the way of a more drastic statute than that which has been enacted in our alien land law. That such was not the intention of either the treaty makers or the framers of our alien land legislation seems to us clear.

The judgment is affirmed.

Myers, C. J., Seawell, J., Waste, J., Shenk, J., and Lennon, J., concurred.