107 Cal.Rptr.2d 119 (2001)
89 Cal.App.4th 103
The PEOPLE, Plaintiff and Respondent,
v.
Mac David COCHRAN, Defendant and Appellant.
No. D034916.
Court of Appeal, Fourth District, Division One.
May 17, 2001.
As Modified on Denial of Rehearing June 14, 2001.
Review Granted September 19, 2001.
*122 Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.
*123 Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle M. Boustany and Arlene Aquintey Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.
KREMER, P.J.
Mac David Cochran, following a court trial, was found guilty of 27 counts of aggravated sexual assault of a child (Pen. Code,[1] § 269), 10 counts of forcible lewd conduct with a child under 14 years of age (§ 288, subd. (b)(1)), and one count of employment of a minor to produce pornography for commercial purposes (§ 311.4, subd. (b)). On appeal, Cochran contends there was insufficient evidence of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to support the aggravated assault and forcible lewd conduct offenses and there was insufficient evidence of "commercial purposes" to support the remaining count. We find merit to his last contention and therefore reverse the judgment on that count. In all other respects, we affirm.

FACTS
The FBI, after receiving information that someone had posted child pornography on an Internet newsgroup, obtained the e-mail address of the individual who posted the pornography and traced the email address to Cochran. A search of Cochran's home was conducted. In the home police found a videotape Cochran had made of his daughter and himself, and from which the photographs on the Internet were taken. The videotape shows Cochran directing his daughter to engage in various sexual acts such as displaying her vaginal area to the camera, digitally penetrating herself, and penetrating herself with a dildo and a vibrator. The videotape also shows Cochran engaging in various sexual acts with his daughter, including penetrating her vagina with his finger, a dildo, a vibrator, his penis, and sodomizing her. This videotape constituted the primary evidence against Cochran.
After he was arrested, Cochran said something to the effect of "when you're caught, you're caught." Cochran admitted posting the photographs, stating he had made the stills in the past two months prior to the search in early February 1998 and had posted the photographs on the Internet one time. He also admitted having had a sexual relationship with his daughter for the past four months.
The daughter testified the sexual relationship with her father began in the summer before the search, when she started the fourth grade. He filmed her with the video camera only one time. She was not afraid of him. Sometimes he would hurt her "[j]ust a little bit, but not that much," and when she told him it hurt, he would stop. Afterwards, Cochran would give her money, things for school or candy. He told her not to tell anybody because he would get into trouble and would go to jail. She was sometimes sad and sometimes mad about the things Cochran was doing to her.

DISCUSSION

I

Sufficiency of EvidenceForce or Duress
When an appellant challenges the sufficiency of the evidence to support a conviction, the appellate court reviews the entire record to see "`whether it contains substantial evidencei.e., evidence that is credible and of solid valuefrom which a rational trier of fact could have *124 found the defendant guilty beyond a reasonable doubt.'" (People v. Jennings (1991) 53 Cal.3d 334, 364, 279 Cal.Rptr. 780, 807 P.2d 1009.) We view the facts in the light most favorable to the judgment, drawing all reasonable inferences in its support. (People v. Kelly (1992) 1 Cal.4th 495, 528, 3 Cal.Rptr.2d 677, 822 P.2d 385; People v. Pensinger (1991) 52 Cal.3d 1210, 1236, 278 Cal.Rptr. 640, 805 P.2d 899.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (See People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal. Rptr.2d 23, 864 P.2d 103; People v. Jones (1990) 51 Cal.3d 294, 314, 270 Cal.Rptr. 611, 792 P.2d 643.) The test on appeal is not whether we believe the evidence established the defendant's guilt beyond a reasonable doubt, but whether "` "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" (People v. Kelly (1990) 51 Cal.3d 931, 956, 275 Cal.Rptr. 160, 800 P.2d 516; People v. Rich (1988) 45 Cal.3d 1036, 1081, 248 Cal.Rptr. 510, 755 P.2d 960.)
The offenses of aggravated sexual assault and forcible lewd acts on a child under the age of 14 years require proof that "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" was used. (§§ 269, subds. (a)(3) & (4), 288, subd. (b)(1).)
"Force" as used in this context means "physical force substantially different from and substantially greater than that necessary to accomplish the lewd act" itself. (People v. Cicero (1984) 157 Cal. App.3d 465, 474, 204 Cal.Rptr. 582, italics omitted.) A number of cases have held that if the defendant grabs or holds a victim who is trying to pull away, that is the use of physical force above and beyond that needed to accomplish the act. (See People v. Babcock (1993) 14 Cal.App.4th 383, 386-388, 17 Cal.Rptr.2d 688, and cases cited therein; but see People v. Schulz (1992) 2 Cal.App.4th 999, 1004, 3 Cal. Rptr.2d 799 [force not found when defendant grabbed victim's arm and held her while fondling her]; People v. Senior (1992) 3 Cal.App.4th 765, 774, 5 Cal. Rptr.2d 14 [force not found when defendant pulled the victim back when she tried to pull away from oral copulations].)[2]
"Duress" as used in this context means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (People v. Pitmon (1985) 170 Cal.App.3d 38, 50, 216 Cal.Rptr. 221; People v. Wilkerson (1992) 6 Cal.App.4th 1571, 1578-1579, 8 Cal.Rptr.2d 392.) "The total circumstances, including the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress." (People v. Pitmon, supra, at p. 51, 216 Cal.Rptr. 221.) Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family. (People v. Senior, supra, 3 Cal.App.4th 765, 775, 5 Cal.Rptr.2d 14; People v. Schulz, supra, 2 Cal.App.4th 999, 1005, 3 Cal.Rptr.2d 799.)
The fact that the victim testifies the defendant did not use force or threats *125 does not require a finding of no duress; the victim's testimony must be considered in light of her age and her relationship to the defendant. Thus, in People v. Pitmon, supra, 170 Cal.App.3d 38, 47-48, 51, 216 Cal.Rptr. 221, the court found sufficient evidence of duress despite the victim's testimony the defendant did not use force or violence and never threatened to hurt her. The court stated that "at the time of the offenses, [the victim] was eight years old, an age at which adults are commonly viewed as authority figures. The disparity in physical size between an eight-year-old and an adult also contributes to a youngster's sense of [her] relative physical vulnerability." (Id. at p. 51, 216 Cal.Rptr. 221; see also People v. Sanchez (1989) 208 Cal.App.3d 721, 747-748, 256 Cal.Rptr. 446 [duress found where defendant molested 8-year-old granddaughter repeatedly over a three-year period and victim viewed defendant as a father figure]; People v. Superior Court (Kneip) (1990) 219 Cal. App.3d 235, 239, 268 Cal.Rptr. 1 ["Where the defendant is a family member and the victim is young, ... the position of dominance and authority of the defendant and his continuous exploitation of the victim" is relevant to determining duress].)
Cochran relies on People v. Hecker (1990) 219 Cal.App.3d 1238, 268 Cal.Rptr. 884, a decision by this court. In Hecker, the defendant molested his 12-year-old stepdaughter. She testified she was never consciously afraid the defendant would harm her and that, with exception of one incident where he held her head down during oral copulation, he never used physical force. She did not report the incidents because she felt "`guilty'" and did not want to be responsible for breaking up her mother's marriage. (Id. at p. 1242, 268 Cal.Rptr. 884.) She testified she felt "`pressured psychologically'" and "`subconsciously afraid.'" (Id. at p. 1250, 268 Cal.Rptr. 884.) "[T]here was no evidence [the defendant] was aware of and sought to take advantage of such fear." (Ibid.) We stated: "`Psychological coercion' without more does not establish duress. At a minimum there must be an implied threat of `force, violence, danger, hardship or retribution.'" (Id. at pp. 1250-1251, 268 Cal. Rptr. 884.) We rejected the People's argument that duress was established by the victim's testimony the defendant urged her not to report the molestations because it would ruin his marriage and naval career, stating "such testimony establishes merely the threat of hardship directed at `later disclosure of the sex acts and not [the failure to perform] the sex acts themselves.' " (Id. at p. 1251, fn. 7, 268 Cal. Rptr. 884, quoting from People v. Bergschneider (1989) 211 Cal.App.3d 144, 154, fn. 8, 259 Cal.Rptr. 219, original italics omitted.)
We believe this language in Hecker is overly broad. The very nature of duress is psychological coercion. A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent. We also note that such a threat also represents a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults. Finally, we note that Hecker is factually distinguishable in that the Hecker victim was 12 years old and the defendant was her stepfather. Here, in contrast, the victim was nine years old and the defendant was her father.
Our review of the videotape supports a finding of duress. The victim was only nine years old. Cochran is her father with whom she resided. She was 4'3" tall. *126 He was 5'9" tall and outweighed her by about 100 pounds. The sexual acts occurred in the family home she shared with Cochran and her mother.[3] Throughout the videotape, Cochran directs and coaches the victim what to do. It is clear the daughter is reluctant to engage in the activities and, at most, acquiesces in the conduct. The victim engages in the conduct only because she is directed to do so and stops as soon as Cochran stops directing her to do a particular act. During a segment where she is orally copulating Cochran, she repeatedly gags, curls up on the sofa away from Cochran, and only continues reluctantly and as a matter of compliance with parental authority. During other parts of the videotape, she complains Cochran is hurting her. Cochran responds he is not hurting her, that he is not yet finished, or sometimes alters his activity.[4] During the videotape, the victim expresses concern about her mother returning home. Cochran discounts her concern, telling her they will hear the door open when the mother returns.
Additionally, there was the victim's trial testimony. Although she testified she was not afraid of Cochran, that he did not beat or punish her and never grabbed or forced her, she also testified she was mad or sad about what he was doing to her, that he gave her money or gifts when they were alone together, and that he told her not to tell anyone because he would get in trouble and could go to jail.
This record paints a picture of a small, vulnerable and isolated child who engaged in sex acts only in response to her father's parental and physical authority. Her compliance was derived from intimidation and the psychological control he exercised over her and was not the result of freely given consent.[5] Under these circumstances, given the age and size of the victim, her relationship to the defendant, and the implicit threat that she would break up the family if she did not comply, the evidence amply supports a finding of duress.
Since we have found duress, we need not discuss whether force was also present.[6]
No reversal is merited on this ground.

II

Employing a Minor to Produce Pornography for Commercial Purposes
Cochran contends the evidence is insufficient to support his conviction of section *127 311.4, subdivision (b) because the evidence did not show that the photographs were produced for "commercial purposes." [7]
Section 311.4, subdivision (b) provides:
"Every person who, with knowledge that a person is a minor under the age of 18 years, or who, while in possession of any facts on the basis of which he or she should reasonably know that the person is a minor under the age of 18 years, knowingly promotes, employs, uses, persuades, induces, or coerces a minor under the age of 18 years, or any parent or guardian of a minor under the age of 18 years under his or her control who knowingly permits the minor, to engage in or assist others to engage in either posing or modeling alone or with others for purposes of preparing any representation of information, data, or image, including, but not limited to, any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD-ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any manner, any film, filmstrip, or a live performance involving, sexual conduct by a minor under the age of 18 years alone or with other persons or animals, for commercial purposes, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years." (Italics added.)
"Section 311.4 is `part of a statutory scheme "to combat the exploitive use of children in the production of pornography.'"" (People v. Pecci (1999) 72 Cal. App.4th 1500, 1509, 86 Cal.Rptr.2d 43.) The statutory scheme is "aimed at extinguishing the market for sexually explicit *128 materials featuring children." (People v. Cantrell (1992) 7 Cal.App.4th 523, 540, 9 Cal.Rptr.2d 188.) Section 311.4 is concerned "with visual displays such as might be found in films, photographs, videotapes and live performances" and "prohibits the employment or use of a minor ... in the production of material depicting that minor in `sexual conduct[.]'" (Ibid.) The statute's prohibition applies whether or not the employment or use is for commercial purposes; subdivision (b) of section 311.4 requires the employment or use be for commercial purposes while subdivision (c) does not require a commercial purpose.
The term "commercial purposes" is not defined in the statute. However, it has been recognized that the phrase is one of common understanding and "is a phrase generally associated with a profitmaking enterprise." (People v. Tatman (1993) 20 Cal.App.4th 1, 13, 24 Cal.Rptr.2d 480 [rejecting claim that jury should have been instructed on the meaning of "commercial purposes" in a prosecution of conspiracy to take abalone for commercial purposes].) As a rule of statutory construction, we must adopt the usual, commonplace meaning of a phrase unless a contrary intention appears. (See People v. Green (1995) 36 Cal.App.4th 280, 282, 42 Cal.Rptr.2d 249.) There is no indication the Legislature intended any contrary interpretation. It is also clear that under statutory scheme, the Legislature has provided for different punishment depending upon the individual's intent. If the individual had a commercial purposes intent, then the Legislature has provided for punishment ranging from three to eight years (§ 311.4, subd. (b)). If there is no commercial purposes intent, then the punishment ranges from 16 months to three years. (§ 311.4, subd. (c).)[8]
Here, the People's evidence consisted only of showing that Cochran on one occasion posted stills from the videotape on an Internet newsgroup and that subsequently other persons also posted the photographs. No evidence was presented that Cochran sought to make any money from these photographs, e.g., offered to sell copies of the posted photographs or other stills from the videotape.
The Attorney General, based on People v. Pitts (1990) 223 Cal.App.3d 606, 273 Cal.Rptr. 757 (the only published case addressing this issue), argues the commercial purpose was shown by Cochran's use of "various lighting techniques to enhance the quality of the video" and Cochran's possession of two other cameras and a computer. The reliance on Pitts is misplaced. The evidence in Pitts showed the equipment used, "especially the lighting, [was] fairly sophisticated when compared to that used for ordinary home videos." (Id. at p. 886, 273 Cal.Rptr. 757.) Here, in contrast, there was no testimony that the equipment used was anything other than typical for ordinary home videos. Furthermore, in Pitts, there was other abundant evidence showing the videotapes were produced for commercial purposes. One of the adults testified she had sold one of the videos for drugs and other "stuff." (Id. at p. 885, 273 Cal.Rptr. 757.) In the videotapes, a voice identified the participants, an identification that would be unnecessary if the videotapes were made solely for personal use since the participants were all family members or acquaintances. There was also evidence that every other weekend videotapes were made of virtually the same acts and participants, *129 yet there was no stockpile of videotapes, no copying equipment and a reasonable inference could be drawn that the videotapes were sold as quickly as they were produced. In Pitts, substantial evidence established the defendants were selling the pornographic videos they made using children.
None of the Pitts' factors are present in this case. There is no showing that any sophisticated equipment was used here. There was no identification of the participants. Only one videotape was produced. There was no evidence that Cochran had, at any time, sold prior videotapes or had solicited money for either this videotape or stills from the videotape. This case is readily distinguishable from Pitts where a commercial purpose (i.e., selling the videotapes for money) was established.
The Attorney General cites a 1925 case, California v. Tagami (1925) 195 Cal. 522, 529, 234 P. 102, for the proposition that "the term `commercial' also broadly includes `social intercourse between individuals and peoples.'" The Attorney General then points out Cochran did not send out a private e-mail to a specified individual but posted the photographs on a newsgroup and therefore received broader distribution. The Attorney General also points out the photographs were re-posted by others, Cochran possessed professionally produced child pornography and Cochran had been taking computer classes. The Attorney General argues that "[i]t is reasonable to infer that [Cochran] was striving toward commercial quality material in the `movie' he was making," and therefore "there was substantial evidence that appellant's act of posting the images on the Internet was for [a] commercial purpose."
Initially, we note the Attorney General's reliance on Tagami is misplaced. That case, interpreting a treaty between the United States and Japan, when read as a whole, clearly equates "commercial" with trade, business and making a profit; it does not hold that the term "commercial" generally means "social intercourse." (California v. Tagami, supra, 195 Cal. 522, 529-532, 234 P. 102.) Second, we reject the concept that a commercial purpose is shown merely by a one-time posting on an Internet newsgroup. Posting photographs on an Internet newsgroup is not dissimilar from posting photographs on a cork bulletin board. We hardly believe that the posting, for example, of photographs from an office party in the office coffee room, in and of itself, constitutes posting for a commercial purpose. There must be some other evidence, e.g., some indication that the photographs are intended for sale or are intended as advertisements for future sales. The Attorney General's conclusion that a commercial purpose is shown by the simple posting of the photographs constitutes mere speculation and speculation does not constitute substantial evidence. (People v. Morris (1988) 46 Cal.3d 1, 21, 249 Cal.Rptr. 119, 756 P.2d 843, disapproved on other grounds in In re Sassounian (1995) 9 Cal.4th 535, 543, fn. 5, 37 Cal.Rptr.2d 446, 887 P.2d 527.) Nor does the re-posting of the photographs by others show that Cochran had a commercial purpose when he posted the photographs. The re-posting of the photographs may demonstrate the invidious nature of the Internet in perpetuating the appearance of material even after it has been removed from a particular site, but it does not show that person posting the material had a commercial purpose, i.e., an intent to make a profit, when he posted the material.
The fact that Cochran was taking computer classes, when considered either by itself or in combination with the other evidence, does not tend to show a commercial purpose since no evidence was presented as to the nature of the computer *130 classes or that any specialized training was necessary in order to post the photographs. Moreover, even if we were to agree with the Attorney General that Cochran "was striving toward commercial quality material in the `movie' he was making," [9] it does not necessarily follow that he posted these particular images for a commercial purpose. There needs to be some additional evidence to show these particular images were posted for a commercial purpose.
In sum, all the People proved at trial was that Cochran used a minor to produce pornographic images which he then distributed through the Internet. The People did not prove that Cochran had any profit-making intent, i.e., a commercial purpose, when he posted the images.
Cochran's challenge to his conviction under section 311.4 is limited to the finding he had a commercial purpose. He does not challenge the sufficiency of the evidence to support a finding he employed a minor to create pornographic images. Nor, given the evidence in this case, would such a challenge succeed. The record therefore indicates that although he may not have been guilty of section 311.4, subdivision (b), he was guilty of the lesser included offense of section 311.4, subdivision (c), which does not require proof of a commercial purpose. Accordingly, we order the judgment modified to reflect a conviction of section 311.4, subdivision (c). (See § 1260; People v. Matian (1995) 35 Cal.App.4th 480, 488, 41 Cal.Rptr.2d 459 [appellate court has the power to modify a judgment to reflect a conviction of a lesser included offense when the evidence is insufficient to support conviction of the greater offense].)

DISPOSITION
Cochran's conviction of section 311.4, subdivision (b) is ordered modified to a conviction of section 311.4, subdivision (c) and, as modified, the judgment is affirmed.
McDONALD, J., concurs.
BENKE, J., concurring and dissenting.
I concur in part I of the majority opinion, but respectfully dissent from part II. Under a proper interpretation of the statute, the record is sufficient to sustain the trial court's finding that Mac David Cochran violated Penal Code[1] section 311.4, subdivision (b).
I begin where my colleagues end. Their discussion of section 311.4, subdivision (b), concludes with the following statement: "The People did not prove that Cochran had any profit-making intent, i.e., a commercial purpose, when he posted the images." (Maj.opn., p. 130.) I believe this statement is inaccurate in two respects. First, I do not believe the People were required to prove Cochran intended to personally profit from distribution of the videotape. Rather, all that is required by the terms of the statute is that violators act with an intent or knowledge that an image of sexual conduct by a child will be marketed commercially. While proof of a personal profit motive would certainly be convincing evidence that a person acted with an intent that sexual images of a child would be commercially distributed, the statute covers more than those who directly profit from the sexual exploitation of children. It also covers those who, for whatever reasons, provide material assistance to the profit makers.
Secondly, in determining a violator's intent, section 311.4, subdivision (b), requires *131 that we look to the point in time when a child is persuaded or coerced into creating an image of sexual conduct, not later when an attempt to disseminate an image occurs. While evidence of later marketing would certainly be circumstantial evidence of a defendant's intent or knowledge at the time an offending image was created, evidence of actual marketing is not required to show that when a child was induced to make sexual images the defendant understood that those creating the images planned to market them.
Cochran clearly violated the statute as I interpret it. Although Cochran may not have been the most sophisticated pornographer and he may not in fact have been very effective in marketing the videotape he made, nonetheless I think the record shows that at the time he videotaped his daughter, his intent was that the tape would eventually be distributed on some commercial basis.

I
By its express terms, section 311.4, subdivision (b), makes it a crime to persuade, induce or permit a child to pose for commercial pornography. It does not govern the sale or distribution of child pornography; that conduct is governed by the separate provisions of section 311.2, subdivision (b), which make it a felony to commercially distribute obscene material which contains sexual conduct performed by a child. Because section 311.2, subdivision (b), governs the distribution of pornography, it is subject to rigorous First Amendment scrutiny which it satisfies by including the element of obscenity. (Baker, Preying on Playgrounds: The Sexploitation of Children in Pornography and Prostitution (1978) 5 Pepperdine L.Rev. 809, 838-839 (Baker).)
The Legislature's dual approach is necessary because "[c]hild pornography is in essence a hybrid industry composed first of producers, who directly exploit the child physically to create a pornographic product, and secondly the close association of manufacturers, distributors, and retailers who cultivate and perpetuate the child pornography market. [¶] Regulation of both aspects, the child abusing producer as well as the distribution and retail of the pornographic materials, must be dealt with individually and harmonized to provide the most powerful deterrent to the practice of child sexploitation." (Baker, supra, 5 Pepperdine L.Rev. at pp. 824-825.) Thus section 311.4, subdivision (b), is but one part of a "double-barreled legislative attack which treats producers as child abusers whether or not the material is obscene, and deals with distributors and retailers of `obscene' materials depicting minors under [F]irst [A]mendment analysis." (Id. at pp. 838-839, fns. omitted.)
Section 311.4, subdivision (b), covers every person who "promotes, employs, uses, persuades, induces, or coerces a minor under the age of 18 years, or any parent or guardian of a minor under the age of 18 years under his or control who knowingly permits the minor, to engage in ... either posing or modeling ... for purposes of preparing any representation of information, data, or image ... that contains ... sexual conduct by a minor ... for commercial purposes...." As I read this provision, the phrase "for commercial purposes" modifies only that portion of the sentence which begins with "preparing any representation." The phrase does not modify the entire sentence. That is to say, the statute covers more than persuasion or coercion of a child for one's own commercial purposes. Rather, the statute punishes anyone who, for whatever purpose, persuades a child to model for an image which will be commercially exploited. Thus to violate the statute a person need not have any personal financial interest in the distribution of an image; a defendant need only understand that the image is being *132 created so that it can eventually be commercially exploited.
An interpretation which does not require that a defendant act for personal profit is consistent with the intent of the Legislature in imposing lengthier sentences on those who participate in creating commercial images as opposed to those who create images intended only for personal use. Any production of sexual images of a childwhether for commercial purposes or private usecreates harm beyond what a child suffers from being required or encouraged to perform a sexual act. "`The pornographic photographer subordinates the humanity of his subject to the sexuality of the subject' and makes his subject `a mere means [¶] serving the voyeur's purposes.' [Citation.] [11] [T]he Legislature could reasonably conclude that such photography is unacceptable if the photographer obtains his pictures by exploiting his subject and reducing the child to a sexual object in order to satisfy the cravings of an audience of pedophiles. A child should not have to face a lifetime of knowing that a permanent record has been made of his or her abasement." (People v. Kongs (1994) 30 Cal.App.4th 1741, 1753-1754, 37 Cal. Rptr.2d 327.) Thus even if there is no proof of a commercial purpose whenever a sexual image of a child has been created, a felony has occurred. (§ 311.4, subd. (c) ["It is not necessary to prove commercial purposes in order to establish a violation of this subdivision"]; People v. Kongs, supra, 30 Cal.App.4th at p. 1752, 37 Cal.Rptr.2d 327.)
Plainly however, the harm a child will suffer increases markedly if the record of his or her sexual conduct is widely disseminated rather than used solely for the producer's own gratification. For this reason section 311.4, subdivision (b), provides for increased punishment when an image has been created for commercial purposes. Importantly, the increased humiliation and stigmatization caused by commercialization of an image occurs whether the person who persuaded a child to perform was acting for personal profit or, as commentary in the area suggests is a common occurrence, out of some other base motive. (See e.g. Baker, supra, 5 Pepperdine L.Rev. at p. 834.) In short it is the commercialization of the image rather than the commercialization of the defendant which poses the risk of increased harm and justifies an increased penalty.
This broader interpretation of the statute is consistent with the express inclusion in the statute of parents and guardians who merely "permit" their children to be used in creating sexual images. Although there are parents or guardians who permit the sexual exploitation of their children for personal profit, plainly the Legislature recognized that there are also parents and guardians who, for reasons unrelated to personal profit, will knowingly permit others to commercially exploit their children. "`[A] constant rule seems to be that children under the age of nine are usually introduced to it (child pornography or prostitution) by their parents.' Often, parents involve their children because they themselves were once pornography stars or models." (Baker, supra, 5 Pepperdine L.Rev. at p. 818, fn. omitted.) "[P]arents who allow their children to participate in sexually explicit activities are central figures in the child pornography process." (Id. at p. 834.)
Thus section 311.4, subdivision (b), does not require proof that a defendant expected to personally profit from inducing, coercing or permitting a child to participate in the production of pornography. It only requires proof that a defendant expected the pornography would eventually be commercialized.

II
Because by its terms and design section 311.4, subdivision (b), governs the production *133 of child pornography rather than its distribution or marketing, the statute looks to the intent and knowledge of the defendant at the time an offending image is produced rather than when an attempt to market the image is made or, as no doubt occurs, marketing is abandoned. In this regard the "commercial purpose" required by section 311.4, subdivision (b), is analogous to the "commercial purpose" required by Public Resources Code section 4527 and discussed at some length in Hewlett v. Squaw Valley Ski Corp. (1997) 54 Cal. App.4th 499, 521, 63 Cal.Rptr.2d 118 (Hewlett).
Public Resources Code section 4581 requires that anyone conducting "timber operations" must first prepare a timber harvesting plan and obtain approval of the plan from the California Department of Forestry. Public Resources Code section 4527 defines "timber operations" as "the cutting or removal or both of timber or other solid wood forest products, including Christmas trees, from timberlands for commercial purposes." (Italics added.) In Hewlett the operator of a ski resort cut 1,800 trees without an approved timber harvesting plan. In attempting to avoid liability for violation of Public Resources Code section 4581, the resort operator argued that because it eventually abandoned its effort to sell the cut trees, it had not engaged in any timber operations within the meaning of Public Resources Code section 4527. In rejecting this argument, the court stated: "The phrase `cutting ... for commercial purposes' focuses on intent. The dictionary defines `purpose' as `something set up as an object or end to be obtained: INTENTION.' [Citation.] By utilizing the phrase `cutting ... for commercial purposes,' the Legislature focused on a party's intent at the time the trees were cut. Had the Legislature been more concerned with the ultimate use of the timber, it could easily have defined `timber operations' as `the sale of cut timber.' It did not do so." (Hewlett, supra, 54 Cal. App.4th at p. 524, 63 Cal.Rptr.2d 118.)
Here section 311.4, subdivision (b), includes the phrase "preparing any representation ... for commercial purposes." Like the language considered in Hewlett, this language focuses on intent at the time the proscribed conduct occurs rather than the ultimate consequence of such conduct. As we have seen, in dealing with the ultimate use of child pornography, the Legislature enacted the separate and distinct provisions of section 311.2, subdivision (b). (See Baker, supra, 5 Pepperdine L.Rev. at pp. 838-839.)
In sum section 311.4, subdivision (b), does not, as the majority opinion seems to suggest, require any showing a proscribed image was in fact marketed.

III
In reversing Cochran's conviction for producing child pornography because there is no evidence Cochran had any commercial purpose when he posted still pictures from the video on an internet bulletin board (maj.opn., p. 130), the majority opinion imposes on the People burdens which are only appropriate in a prosecution for distribution of child pornography under section 311.2, subdivision (b). By requiring proof of a commercial purpose at the time of the internet posting, my colleagues have failed to appreciate the distinct nature of the crime set forth in section 311.4, subdivision (b), and the ample evidence Cochran is guilty of that crime.
Plainly, an Internet posting, by itself, does not constitute the commercial distribution of child pornography within the meaning of section 311.2, subdivision (b). Indeed, section 311.2, subdivision (b), requires more than proof of a commercial purpose, it requires an exchange of "commercial consideration." However, with *134 respect to Cochran's conviction for producing commercial child pornography, the Internet posting is a very different matter. The posting is powerful circumstantial evidence of what Cochran was planning at the time he made the videotape. There can be little doubt that the posting was an attempt to attract the attention of the untold number of pedophiles and marketers of child pornography who, as a practical matter, cannot be reached by any other means. Especially given the planning and effort required to create the images which appear on the videotape, the attempt to attract broad attention to the tape strongly suggests that at the time he produced the tape Cochran intended to market it.
The tape itself reveals the considerable planning and effort Cochran devoted to its production. The tape consists of 11 separate episodes with a total running time of approximately 18 minutes. Among other matters, one striking feature of the videotape is its progressive nature: In those 18 minutes and 11 distinct episodes Cochran can be seen performing increasingly more serious sex acts on his daughter. The tape begins with Cochran's daughter urinating in a toilet and is followed by an episode in which she touches her vagina, exposes it to the camera, and then permits Cochran to touch it. From these less serious acts the tape progresses in distinct episodes to the victim's oral copulation and masturbation of Cochran, to use of a dildo and vibrator by the victim and Cochran, to intercourse, to sodomy, to Cochran's ejaculation on the victim's vagina. The tape ends with Cochran wiping the victim's vagina and the victim saying "bye bye camera."
The creation of a videotape portraying the progressive degradation of the victim required some substantial editing on Cochran's part. Although the editing was apparently accomplished by the relatively simple means of starting and stopping the camera at different points, the changes in camera angle, lighting, and positioning of the victim which can be seen on the tape show that each episode was separated by a period of time and some planning by Cochran as to what he wanted to record in each succeeding episode. There is little if any recording of what occurred between episodes. Rather, the tape, although occasionally interrupted by periods of no images, is relentless in its focus on sex acts performed by and on the victim.
Still another feature of the videotape which is telling is Cochran's direction of the victim's activity. Repeatedly, Cochran can be heard not only instructing the victim to perform various acts but also telling the victim to move her genital area and buttocks into the center of the camera's focus.
Taken together, Cochran's Internet posting and the substantial effort needed to record the progressive abuse of his victim strongly suggest the tape was prepared for far more than Cochran's personal use. Thus the record, as I view it, fully supports Cochran's conviction under section 311.4, subdivision (b).
In closing I note that even in the absence of the evidence which shows a commercial purpose within the meaning of section 311.4, subdivision (b), there can be no serious dispute the record fully supports a finding Cochran was guilty of the lesser included offense of producing noncommercial child pornography in violation of section 311.4, subdivision (c). Thus the majority's analysis requires at most that Cochran's conviction be reduced to a violation of section 311.4, subdivision (c), as opposed to outright reversal of the section 311.4, subdivision (b), conviction. (See e.g. People v. Steger (1976) 16 Cal.3d 539, 553, 128 Cal.Rptr. 161, 546 P.2d 665; People v. Flores (1974) 12 Cal.3d 85, 95, 115 Cal. Rptr. 225, 524 P.2d 353.)
NOTES
[1] All statutory references are to the Penal Code unless otherwise specified.
[2] Schulz and Senior are both decisions of the Sixth District. Both cases affirmed on the basis of duress. (People v. Schulz, supra, 2 Cal.App.4th 999, 1005, 3 Cal.Rptr.2d 799; People v. Senior, supra, 3 Cal.App.4th 765, 774-775, 5 Cal.Rptr.2d 14.)
[3] Cochran and the mother were married. Also living in the home was Cochran's brother.
[4] This contradicts the victim's testimony that he would stop when she told him it hurt.
[5] Cochran contends that the factors noted by the trial judge (and upon which we have also relied) "exist universally between fathers (or father figures) and children" and that to adopt these factors would result in "no recognizable or enforceable distinction between subdivisions (a) and (b) of section 288, no real distinction between forcible crimes and consensual crimes" and "[t]he guarantee of due process of law will not permit [the] universal features of parent-child relationships to be substituted for a criminal law requirement of `force' or `duress.'" Neither the trial court's ruling nor our ruling on appeal hold that the parent/child relationship, as a matter of law, establishes force or duress. Nonetheless, as a factual matter, when the victim is as young as this victim and is molested by her father in the family home, in all but the rarest cases duress will be present. This conclusion does not eliminate the distinction between subdivisions (a) and (b) of section 288; those subdivisions may be violated by persons other than the child's parent or one having parental authority and under circumstances where the victim truly consents, e.g., a 13-year-old girl consenting to engage in sexual acts with her boyfriend.
[6] We note that most of the acts do not involve the use of any force, or even restraint of the victim, since the victim was being compliant.
[7] The dissent appears to read section 311.4, subdivision (b) as not requiring that the defendant have a commercial purpose in using a child to create pornographic images; but only as requiring that the defendant be aware that potentially there may exist someone who might later make a commercial use of the images. Essentially, the dissent requires only distribution, not a commercial purpose since whenever a pornographic image is distributed to another there exists the possibility that someone down the road may make a commercial use of the image. The dissent essentially reads the statute as setting up a dichotomy between personal use and distribution to others. While we agree with the dissent's opening analysis that distribution is harmful to a child and may warrant additional punishment, the dichotomy set up by section 311.4 is not based on a distinction between personal use versus distribution to others but rather is based on a distinction between a non-commercial versus a commercial purpose. The dissent reads into the statute a distribution/personal use distinction that does not exist in the statute.

The dissent also fails to identify any evidence, even under its interpretation of the statute, to support a conclusion a commercial purpose existed in this case. The evidence shows only the making of a videotape and the later posting of the images on the Internet. The fact Cochran directed the victim as to the particular acts and that the acts become more serious as the videotape progresses reveals nothing as to Cochran's motive. Directing a reluctant victim to engage in progressively more serious acts is as consistent with a personal as it is with a commercial purpose. Moreover, the poor quality of the videotape (including the fact a television is blaring in the background) tends to militate against a finding of a commercial purpose. Nor does Cochran's posting of the image on the Internet reveal a commercial purpose since the evidence shows only that it was posted on an Internet bulletin board. There was no evidence even suggesting Cochran's purpose in posting the image was to solicit sales of additional images from the videotape or to have images from the videotape be commercially marketed by someone else. Neither the making of the videotape nor the posting of the image on the Internet, considered singly or in combination, establish a commercial purpose existed when the victim was used to make the images.
[8] Section 311.4, subdivision (c) states violation of the subdivision is a felony but does not state a specific term of imprisonment. When a statute does not specify the term for a felony, then the term is 16 months, two years, or three years. (§ 18.)
[9] We note the production values of the videotape are quite low and include a television broadcasting in the background as well as Cochran's coaching of the victim.
[1] All further statutory references are to the Penal Code.