[No. D009413. Fourth Dist., Div. One. Apr. 26, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE CHARLES HECKER, Defendant and Appellant.

COUNSEL

Richard Schwartzberg and Goldfein, Schwartzberg & Stark for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Lilia E. Garcia and Roy W. Hewitt, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WIENER, J.—Defendant George Charles Hecker appeals after a jury found him guilty on five counts of committing a lewd or lascivious act with a minor under the age of fourteen by means of force (Pen. Code, § 288, subd. (b))[1] and one count of committing such an act without force (§ 288, subd. (a)). He argues the court erroneously excused a juror midtrial and made two improper evidentiary rulings. He also asserts that the evidence supporting two of the counts was insufficient to establish that the acts were

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

accomplished by means of force. With the exception of his last contention, we reject his arguments. We modify the judgment to reduce his convictions on two counts to violations of section 288, subdivision (a). As modified, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The victim, Gail A., was Hecker's stepdaughter. She was born December 2, 1972, and was 12 or 13 at the time of the alleged offenses. Before trial, the prosecution specified that three of the five section 288, subdivision (b) counts (oral copulation by Gail, oral copulation of Gail, and rape by foreign object) and the section 288, subdivision (a) count (nonforcible fondling of Gail's breasts) related to an alleged incident in November 1985. The remaining two section 288, subdivision (b) counts (vaginal and anal intercourse) related to an alleged incident in November 1986.

On November 9, 1985, Gail dislocated her knee in a slip-and-fall accident which caused her to miss several months of school. Gail testified that one day in late November just before Thanksgiving, she was at home sitting on the couch watching television. Her mother was at work and her brother was at school. At some point Hecker, who was reroofing the house for the landlord, came inside to use the bathroom and get a drink. Then, according to Gail, "he proceeded to touch me in ways that he shouldn't." Gail testified that Hecker touched and licked her breasts and vagina. He placed several fingers inside her vagina. He then forced her to orally copulate him until he ejaculated. She stated she tried to resist Hecker but was unsuccessful.

Gail recounted another incident which occurred in November 1986.[2] When she returned home from school one afternoon, Hecker had just finished a shower. Gail did not remember exactly how it happened but her clothes were removed and she ended up on top of Hecker on his bed. He placed his penis first inside her vagina and then inside her "butt," removing it just before he ejaculated. Gail testified these activities "hurt" her.

Gail also testified about two incidents of molestation which were not charged in the information. Within two months of the November 1985 incident, Gail was just finishing using the bathroom when Hecker entered and asked her if she "would like it better in the front or in the rear [, m]eaning with his penis in my vagina or in my butt." Gail replied she "would rather have it in my butt, because it didn't hurt as much." Hecker

---

[2] Gail was able to place this incident in time by reference to a church ice skating party she attended on November 23, 1986. She testified the molestation occurred approximately two weeks before the ice skating party.

then sat on the toilet and placed his penis "in my vagina and in my butt." Following ejaculation, Hecker told Gail not to worry about getting pregnant because he had had a vasectomy. Gail related that Hecker made similar comments on several occasions during the course of the molestations.

Hecker separated from Gail's mother in July 1987, although he kept his belongings at the family home and continued to visit until August. On one such visit in July after the separation, Hecker began tickling Gail but soon moved his hands up underneath her skirt. As Gail tried to push his hands away, the skirt tore.

On several occasions Hecker told Gail he was doing these things to her because "guys did not usually like girls who were very tight. . . . [H]e wanted to make sure I was loose, so that my future husband, whoever he may be, would not get mad at me." He also warned her not to tell anyone about the molestation incidents because "[i]t would ruin his marriage and his navy career [and] he would be put in jail for a long time." Gail stated she felt "guilty." She did not report the incidents to anyone because she did not want to be responsible for breaking up the marriage.

Gail testified she never willingly engaged in any sex acts with Hecker. She stated, "[H]e forced me; but yet he didn't—I mean by force, he would follow me around the house if I tried to leave the room. . . . So he basically forced me, but yet he didn't use physical force." She also said she felt pressured psychologically and "subconsciously afraid."

Medical experts testified for both the prosecution and defense. The prosecution experts testified to their observations of multiple old tears in Gail's hymen, a two-centimeter hymenal opening, relaxed pelvic floor and sphincter muscles and a very large rectal tag, likely causes of which were the types of sexual penetrations described by Gail in her testimony. The defense experts disputed these conclusions, offering alternative innocent explanations for the physical observations and further testifying about physical findings missing from the reports on Gail which one would expect in cases of forcible sexual abuse of the sort alleged.

## DISCUSSION

### Excusing of Juror Ruff

During presentation of the prosecution's case-in-chief, juror Paradine Ruff requested a conference with the court. She explained that while attending church the previous weekend, she recognized Hecker during a

visitor welcoming ceremony at which he asked to become a member of the church. During questioning by the court and counsel, Ruff explained she was very upset by the incident.

"THE COURT: Thinking about this, does the fact that he stood up in your church, to join your church,—does that interfere with your ability to be fair to him?

"JUROR RUFF: I kind of wondered if it would be. . . . [B]ecause it is not fair to him, and it is not fair to me, and it is not fair to the People with the emotions that I had. [¶] Because up until that time I had no emotions about the case at all. It was just a case that I was listening to, and that was it. [¶] But now all of a sudden it looked like the whole thing just hit me in the face. That has been rough on me, because I haven't even told my husband. . . .

". . . . . . . . . . . . . . . . . . . . .

"[DEFENSE COUNSEL]: Is there any reason you can't go ahead and continue to be a fair juror in this case? [¶] I can tell you Mr. Hecker will not be in church where you will see him—

"JUROR RUFF: That is not the fact, whether he is in church or not. But it is a fact that he came to church, and the fact that he joined the church. [¶] Now I don't want to pass judgment on a person in that situation, basically because usually when you go to court it is supposed to be somebody you have never seen or know anything about. [¶] Now all of a sudden—in fact I guess you can't imagine what I thought. At first I asked myself, 'How did he know what church I went to? How did he get there?' [¶] All this stuff was going through my mind.

". . . . . . . . . . . . . . . . . . . . .

"[PROSECUTOR]: Ma'am, do you think it would be difficult for you to now be impartial, and be fair in this trial?

"JUROR RUFF: It is going to put a burden on me, that is all I can say.

"[PROSECUTOR]: Would you feel more comfortable not sitting on this jury?

"JUROR RUFF: I think I would be a little more comfortable not doing it.

"[PROSECUTOR]: The fact that Mr. Hecker has joined your church, does that make it more difficult for you to stand in judgment of him now?

"JUROR RUFF: I think it would bother me. I would be thinking about that, too. Where before it was just a case.

"[PROSECUTOR]: If I understand you right, Mr. Hecker joining your church clearly is going to interfere with your objectivity in this case?

"JUROR RUFF: It seems like it might. That is the problem.

". . . . . . . . . . . . . . . . . . . . .

"THE COURT: It gets in the way of your being objective?

"JUROR RUFF: Uh-huh. It bothers me. I don't know if that is fair to everybody.

"[DEFENSE COUNSEL]: Can you say you can't be a fair juror now?

"JUROR RUFF: I don't know."

Section 1089 provides that "[i]f at any time, whether before or after the final submission of the case to the jury, a juror . . . is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, . . . ." In *People v. Compton* (1971) 6 Cal.3d 55 [98 Cal.Rptr. 217, 490 P.2d 537], the Supreme Court explained that "the trial court has at most a limited discretion to determine that the facts show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality." (*Id.* at p. 60.)

The facts of *Compton* involved an alternate juror who remarked to his barber in casual conversation that "it would be hard to keep an open mind on a case such as this . . . ." (6 Cal.3d at p. 59.) The trial court never questioned the alternate to clarify the meaning of this ambiguous remark, instead believing it was required to grant a mistrial because there were no other alternates. (*Id.* at pp. 60-61.) Reversing, the Supreme Court explained that the lack of an alternate juror did not require the granting of a mistrial. (*Ibid.*) Moreover, the record did not support the excusing of the alternate because his unclarified ambiguous remark to the barber did not establish he was "unable to perform his duty" within the meaning of section 1089. (*Id.* at p. 60.)

This case presents a far different situation. Under close questioning by both parties and the trial court, juror Ruff was unable to give any assurance that she could decide the case without reference to her experience seeing

Hecker join her church. "I think it would bother me. I would be thinking about that, too," she admitted. In contrast, the alternate juror in *Compton* was never given the opportunity to state whether he could in fact keep an open mind, despite the difficulty in doing so. (6 Cal.3d at p. 60.) Similarly in *People* v. *Franklin* (1976) 56 Cal.App.3d 18 [128 Cal.Rptr. 94], a juror initially expressed doubts about her ability to "separate her personal feelings from the evidence." The Court of Appeal approved the trial judge's decision not to excuse her because she was later able to assure the judge "she could decide the case as her conscience told her, based upon the evidence as presented, leaving her personal experience out of her deliberations." (*Id.* at p. 25.)

Contrary to Hecker's argument, we believe this record indicates "as a demonstrable reality" (*Compton, supra,* 6 Cal.3d at p. 60) that juror Ruff was "unable to perform [her] duty" within the meaning of section 1089 because she could not assure the court she would decide the case by reference exclusively to the law and the evidence. The law certainly cannot require one or both parties to run the risk of a tainted decision where there is any reasonable probability that the decisionmaker will be less than impartial. None of the cases cited by Hecker require a juror to state unequivocally that he or she *will* consider inappropriate or extraneous matters. (See, e.g., *People* v. *Hamilton* (1963) 60 Cal.2d 105, 126 [32 Cal.Rptr. 4, 383 P.2d 412][3] ["If the juror had given any indication that she would substitute her knowledge . . . for the instructions of the court, or would convey such knowledge to the other jurors, then it might have been said that she was incapable of performing her duties."].) An admission by a juror that there is a significant likelihood extraneous matters will enter into the decisionmaking process is, in our view, sufficient to warrant removal of the juror and substitution of an alternate.

*Evidence of Uncharged Acts*

■ Relying principally on *People* v. *Tassell* (1984) 36 Cal.3d 77 [201 Cal.Rptr. 567, 679 P.2d 1], Hecker contends the court erred in admitting Gail's testimony regarding the molestation incidents not charged in the information, i.e., the bathroom incident and the occasion where her skirt was torn. The People respond that Hecker waived any complaint by his failure to object in the trial court. In any event, they assert, the evidence was admissible to demonstrate Hecker's lewd intent towards Gail (see *People* v. *Sylvia* (1960) 54 Cal.2d 115, 120 [4 Cal.Rptr. 509, 351 P.2d 781]), to prove identity, and to place in proper context the medical testimony which suggested a pattern of prior abuse.

---

[3] *Hamilton* was overruled on unrelated grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 637, fn. 2, 653 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].

Assuming arguendo the testimony was improperly admitted, we do not believe it is reasonably probable a result more favorable to Hecker would have been reached in the absence of the evidence. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The case turned on Gail's credibility. The fact that she alleged two additional molestations did nothing to increase her believability. As was true in *People* v. *Brunson* (1986) 177 Cal.App.3d 1062, 1069 [223 Cal.Rptr. 439], the admission of the "other crimes" evidence here—especially given its limited nature—did not prejudice Hecker.

## Exclusion of Evidence Indicating Bias

■  Hecker's theory of defense was that Gail and her mother had fabricated the alleged incidents of molestation in order to permanently remove him from the scene and allow Michelle Hecker to pursue other romantic interests. During the cross-examination of Gail, it was reported to the court that the defense would seek to introduce the testimony of Monroe Brittingham, a family friend to whom Gail had reported the molestations.[4] Brittingham was a close friend of George Hecker's. Defense counsel advised the court that Brittingham's testimony would establish a motive for Gail to lie.

During a hearing out of the presence of the jury held pursuant to Evidence Code section 402, Brittingham testified that several days prior to Gail's revelations, Gail's mother asked him about pursuing a romantic relationship. Both were separated from their respective spouses at the time, although George Hecker was apparently present when the question was posed. According to Brittingham, Michelle Hecker asked him "what would it take for me and her to get together. Something of that nature. [¶] And my response, 'If that is what you want,'—if George was out of the picture and they were separated, divorced, or whatever, six months down the road, if my wife was not home, who knows what would happen." Approximately three days later, according to Brittingham, Gail called him and told him about the alleged molestations.

The trial court ruled the evidence relevant and declined the prosecutor's invitation to exclude the testimony on Evidence Code section 352 grounds.[5]

---

[4] It was Brittingham who reported the alleged molestations to police.

[5] At the same time, the court sustained the prosecutor's Evidence Code section 352 objection to testimony by Brittingham concerning Michelle Hecker's mistaken belief that she would soon be inheriting a large sum of money. During her initial offer of proof, defense counsel stated that part of the defense theory was that Michelle and Gail fabricated the molestation stories to insure that George Hecker never shared any of the inheritance. Brittingham's testimony, however, never established that Michelle wanted to keep George Hecker from getting any money. To the contrary, Brittingham testified that Michelle promised to buy Hecker a new motorcycle. Brittingham also stated Michelle told him within several

Before Brittingham actually testified, however, he spoke with an investigator from the district attorney's office and admitted having offered to pay money to Gail if she would drop the charges against Hecker. At that point, the prosecutor advised the court of this new information, suggesting that counsel might be appointed for Brittingham to advise him regarding the possible Fifth Amendment consequences of his testimony.

With counsel appointed to advise him, Brittingham testified at a second Evidence Code section 402 hearing out of the presence of the jury. He invoked the Fifth Amendment and refused to answer any questions concerning the alleged offer of money to Gail. After extensive argument by counsel, the court ruled that Brittingham would not be allowed to testify concerning Michelle Hecker's statements because his assertion of his Fifth Amendment rights made effective cross-examination by the prosecution impossible. The court explained: "If we were to have this hearing before the jury, in which Mr. Brittingham was allowed to testify, and then [the prosecutor] asked him these questions, and he took the Fifth Amendment, the court would then, under those circumstances, have to strike the testimony[.]

". . . . . . . . . . . . . . . . . . .

"It would be absurd, it would seem to the court, to hold this hearing and permit Mr. Brittingham to testify in the presence of the jury; have these questions asked, in which takes the Fifth Amendment, and then direct the jury to dismiss all that testimony from their mind, to strike it. It does not make sense to the court."

After careful and thoughtful analysis, the trial court concluded it would be obligated to strike Brittingham's testimony because the impeaching questions as to which he claimed the Fifth Amendment privilege deprived the prosecution of its fundamental right of cross-examination. There is some precedent for this view. In *People* v. *Reynolds* (1984) 152 Cal.App.3d 42 [199 Cal.Rptr. 379], the defendant was charged with attempted escape from a county jail after guards found a broken window in his cell and several sheets tied together on the ground underneath the window. The defendant denied trying to escape. Instead, he explained that a group of inmates had forced him to throw the sheet rope out the window on prearranged occasions so that people below could place drugs inside a sock which was tied to the sheets and the drugs could be pulled back into the jail. On cross-examination, defendant refused to name the persons involved in smuggling the

weeks that she was mistaken as to the inheritance. In addition, the prosecutor offered to prove that Michelle Hecker could never have reasonably believed she was receiving an inheritance. Under these circumstances, the trial court properly exercised its discretion in excluding Brittingham's testimony on the very collateral matter of Michelle Hecker's possible inheritance.

drugs because of a fear of retaliation. The Court of Appeal affirmed the trial court's decision to strike all of the defendant's testimony. (152 Cal.App.3d at pp. 46-47.)

Although *Reynolds* approved the striking of the defendant's testimony as being within the trial court's discretion, the court made clear that striking a witness's entire testimony is "a drastic solution." (152 Cal.App.3d at p. 47.) Because it deprives a defendant of the fundamental right to present a defense, it should be utilized only after "less severe means are considered." (*Id.* at p. 48.)

Here, for instance, it might have been appropriate for the court to have permitted Brittingham to testify, allowing the jury to draw negative inferences from his invocation of the Fifth Amendment. (Cf. *United States* v. *Hearst* (9th Cir. 1977) 563 F.2d 1331, 1341-1342.) While it has generally been held inappropriate to allow a jury to draw negative inferences from a witness's appropriate invocation of the privilege against self-incrimination (see *People* v. *Johnson* (1974) 39 Cal.App.3d 749, 760 [114 Cal.Rptr. 545]; *Hearst, supra,* 563 F.2d at p. 1341; see generally *Namet* v. *United States* (1963) 373 U.S. 179 [10 L.Ed.2d 278, 83 S.Ct. 1151]) a different balancing of interests may be appropriate where a party is willing to run the risk of such a negative inference for the purposes of impeachment in order to place before the jury other critical testimony. Alternatively, the court could have allowed Brittingham to be impeached by the investigator's testimony as to his hearsay statements during the interview if it concluded they properly constituted declarations against penal interest. (Evid. Code, § 1230; see *People* v. *Johnson, supra,* 39 Cal.App.3d at pp. 760-761.).)

In any event, even if the court erred in totally excluding Brittingham's testimony, we conclude the error was harmless. The trial court was correct in its conclusion that Hecker was not entitled to place Brittingham's testimony before the jury free from any threat of impeachment. Either of the less restrictive alternatives noted above would have resulted in serious damage to Brittingham's credibility. Moreover, the circumstances of Michelle Hecker's alleged statement to Brittingham (made in George Hecker's presence after their separation) make it unlikely the jury would have interpreted it a serious proposition of the sort which would motivate a mother to convince her daughter to concoct a story of the sort involved in this case. We think it highly unlikely that any error committed by the trial court had any effect on the verdict.[6]

---

[6] At a later point in the trial, the court also precluded defense counsel from asking Michelle Hecker about her relationship with Brittingham. In yet another hearing outside the presence of the jury, Michelle had denied any recollection of any conversation with Brittingham in which they discussed having a relationship. She explained that while she did not view herself

*Sufficiency of the Evidence to Prove Force or Duress*

■   As to the November 1986 incident in the bedroom, Hecker contends the evidence is insufficient to establish the anal and vaginal intercourse was accomplished by force or duress within the meaning of section 288, subdivision (b). Accordingly, he argues, the judgment must be modified to reflect conviction of the lesser included offense proscribed by section 288, subdivision (a).

By enacting the separate subdivisions (a) and (b) of section 288 and ascribing to each identical punishment, the Legislature has manifested an understanding of the ambiguous role played by force in the commission of sex crimes against children. Subdivision (a) makes criminal any lewd and lascivious act with a child under the age of 14 on the assumption and recognition that such a child is incapable of consenting to the act. Subdivision (b) prescribes a separate violation where such act is committed using force or duress. As the court explained in *People* v. *Cicero* (1984) 157 Cal.App.3d 465 [204 Cal.Rptr. 582] with regard to the common law crime of rape, force was often viewed as playing "merely a supporting evidentiary role, as necessary only to insure an act of intercourse has been undertaken against a victim's will." (*Id.* at p. 475; see also *People* v. *Kusumoto* (1985) 169 Cal.App.3d 487, 493 [215 Cal.Rptr. 347].) In the context of section 288, however, the concept of force is not necessary to prove a lack of consent; instead it simply serves to distinguish certain more culpable nonconsensual sex acts from others.

As we have mentioned, the prison terms provided for violation of subdivisions (a) and (b) of section 288 are identical. There are, however, collateral consequences which attach to a conviction under subdivision (b). For instance, a violation of subdivision (b) constitutes a violent felony within the meaning of section 667.6, mandating a substantial sentence enhancement where the defendant has been previously convicted of a violent felony and authorizing full, separate and consecutive sentences under certain circumstances. In addition, section 292 provides that a violation of subdivision (b) "shall be deemed to be a felony offense involving an act of violence and a felony offense involving great bodily harm" within the meaning of the constitutional authorization for denying bail. (See Cal. Const., art. I, § 12, subds. (b) and (c).)

It is within this context that we must consider the Attorney General's contention that the evidence of force and duress was sufficient. Implicitly

---

as prejudiced against Blacks, she did not feel she could be sexually involved with a Black or deal with the stress of an interracial marriage. Having already ruled Brittingham would not testify and based on this information, the trial court properly concluded that questioning Michelle about the purported relationship had the potential to enmesh the jury in collateral issues with no concomitant likelihood of furthering the defense case.

conceding there was no evidence that Hecker used force on the particular occasion in the bedroom, the People direct us to evidence concerning other incidents testified to by Gail. They contend "the 'force' associated with the commission of appellant's other acts and all the circumstances surrounding them are sufficient to show appellant accomplished all the acts charged by means of force." In addition, relying on *People* v. *Cicero, supra*, 157 Cal.App.3d at page 474 and *People* v. *White* (1986) 179 Cal.App.3d 193, 200-201 [224 Cal.Rptr. 467], they assert the medical evidence demonstrated physical injury to Gail which in itself is sufficient to support a finding of force within the meaning of subdivision (b).

In *People* v. *Pitmon* (1985) 170 Cal.App.3d 38 [216 Cal.Rptr. 221], the court suggested that evidence of prior forcible molestation incidents might be sufficient to show that later acts without force were nonetheless accomplished by means of *duress*. (*Id.* at p. 48.) Quite clearly, the *Pitmon* court's conclusion simply acknowledges that where a defendant establishes a prior pattern of force, a child's later compliant submission to the defendant's wishes is likely based on a reasonable fear that force may again be utilized. It does not stand for the proposition that the later incidents were accomplished by the use of force. As to the People's second theory of force, assuming arguendo the medical evidence established physical injury to Gail within the meaning of *Cicero,* there was no evidence tying the physical injury to the bedroom incident in November 1986.

Alternatively, the People contend the evidence is sufficient to support the verdict on the theory that the November 1986 incident was accomplished by means of duress. In *People* v. *Pitmon, supra*, 170 Cal.App.3d at page 50, the court explained that duress is "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (Accord *People* v. *Bergschneider* (1989) 211 Cal.App.3d 144, 154 [259 Cal.Rptr. 219].) There was no evidence here that Hecker threatened Gail. Gail admitted she was never consciously afraid Hecker would harm her. She testified that with the exception of Hecker's pushing her head down during the act of oral copulation in November 1985, he never used physical force. Although Gail stated she felt "pressured psychologically" and "subconsciously afraid," there was no evidence Hecker was aware of and sought to take advantage of such fear. (See *People* v. *Bergschneider, supra*, 211 Cal.App.3d at p. 154, fn. 9.) "Psychological coercion" without more does not establish duress. At a minimum

there must be an implied threat of "force, violence, danger, hardship or retribution."[7]

By enacting subdivision (a) of section 288 and providing the serious penalties it imposes, the Legislature has recognized that all sex crimes with children are inherently coercive. By concluding that the crimes committed by Hecker in November 1986 were not committed using force or duress, we are not downplaying his culpability or minimizing the seriousness of the harm he inflicted on Gail. We are merely giving recognition to the Legislature's determination in enacting subdivision (b) that defendants who compound their commission of such acts by the use of violence or threats of violence should be singled out for more particularized deterrence.

## Disposition

Hecker's convictions on counts two and three are modified to reflect violations of section 288, subdivision (a). As modified, the judgment is affirmed. The case is remanded for resentencing.[8]

Kremer, P. J., and Todd, J., concurred.

The petition of appellant and respondent for review by the Supreme Court was denied August 1, 1990.

---

[7]To support the claim of duress, the People seek to rely on Gail's testimony that Hecker urged Gail not to disclose the molestations because it would ruin his marriage and his naval career. As we explained in *People* v. *Bergschneider,* however, such testimony establishes merely the threat of hardship directed at "later *disclosure* of the sex acts and not [the failure to perform] the sex acts themselves." (211 Cal.App.3d at p. 154, fn. 8.)

[8]A remand is necessary because the court imposed full term consecutive sentences on counts two and three pursuant to section 667.6, subdivision (c).