Filed 7/3/25  P. v. Christopher O. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER O.,<br><br>    Defendant and Appellant. | H051325<br>(Santa Clara County<br> Super. Ct. No. F1901585) |

Defendant Christopher O. was convicted on four counts of child sexual abuse.[1] He now challenges the sufficiency of the evidence supporting one of these convictions, which was for attempted aggravated assault.  Defendant also argues that his convictions on all four counts should be vacated because of juror misconduct.  As explained below, we reject both arguments and affirm.

---

[1] We use initials to refer to the victim in this case to protect her privacy (Cal. Rules of Court, rule 8.90(b)(4), and because the victim and the defendant share a last name, we also use an initial for defendant's last name.  (Cal. Rules of Court, rule 8.90(b)(11).)

## I. BACKGROUND

The facts recounted below are drawn from the record, including the evidence presented at Defendant's trial, which is viewed in the light most favorable to the verdicts in the trial. (See *People v. Banks* (2015) 61 Cal.4th 788, 795.)

### A. The Charges

In May 2019, Defendant was charged with four counts of child sexual abuse against his daughter, C.D. In particular, Defendant was charged with two counts of oral copulation or sexual penetration with a child under the age of 10, one count of sexual intercourse or sodomy with a child under the age of 10, and one count of attempted aggravated sexual assault by sodomy of a child under the age of 14 in violation of sections 269 and 286 of the Penal Code. (Subsequent undesignated statutory references are to the Penal Code.)

### B. The Evidence Presented at Trial

At trial, the prosecutor's primary witness was C.D. C.D testified that Defendant was her father but he separated from her mother when she was five or six years old. Afterwards, C.D. lived with her mother and every other weekend stayed with her father.

Defendant, who is six feet five inches tall and weighs 280 pounds, began sexually abusing C.D. shortly after separation, when she was six or seven years old. The first time, C.D. was lying on a sofa, Defendant removed her pants, and he touched her vagina. Over the next several weeks, Defendant continued to touch C.D., sometimes inserting his finger into her vagina. C.D. found this painful, but when she indicated it hurt, Defendant "laid off." Defendant also licked C.D.'s genitals and rubbed his penis outside them. And several times Defendant penetrated C.D.'s vagina with his penis. This abuse occurred frequently, and C.D. expected it when staying with her father.

Several years later, when C.D. was around 10 years old, C.D. and her mother moved to a new house, and Defendant moved back to the house where C.D. had been living. When C.D. visited Defendant at the house, the sexual abuse continued, largely

2

following the same pattern as before. However, on one occasion, Defendant attempted to put his penis in C.D.'s anus. Defendant came into C.D.'s bedroom and told her to get onto the floor. C.D. had no pants on. (Apparently, when C.D. stayed with her father, they frequently went unclothed.) Defendant rubbed C.D.'s buttocks with his hands and tried to penetrate her, but he was unable to do so because his penis was flaccid, and he gave up. Although C.D. understood what Defendant was trying to do, she said that she complied because "he would cry" and she "didn't like seeing him sad."

When C.D. was in middle school, Defendant moved to another city. The sexual abuse continued when she visited there but was less frequent. By that time, C.D. had a clearer understanding what was happening and sometimes would refuse. In addition, when C.D. was in high school, she told her mother that Defendant's driving scared her, and she was able to stop staying with him.

Nonetheless, C.D. did not tell her mother or anyone else that Defendant had abused her because Defendant told C.D. that, if she did, he would get into trouble. However, in April 2019, while talking with her high school counselor about a friend who was being mistreated, C.D. broke down and confided that she had been abused herself. The counselor reported the abuse to the police, who promptly questioned C.D.

The prosecution also presented testimony from C.D's mother, the counselor, and an expert on Childhood Sexual Abuse Accommodation Syndrome (CSAAS). The defense rested without calling witnesses.

## C. Jury Deliberations

On the second day of jury deliberations, the trial court received a note asking whether it would be appropriate for a juror to ask her children if they remembered their former address—which was pertinent because C.D. had not remembered correctly the address of her first home.

The trial court examined Juror No. 5, the juror who raised the issue. Juror No. 5 testified that a second juror had asked her son whether he could remember his former

address and reported to the rest of the jury that the son could not. After confirming with the foreperson that the second juror had done this, the trial court discharged her and swore in an alternative juror.

The trial court also investigated an accusation from the second juror against Juror No. 5. The second juror said that Juror No. 5 had been referring to traumatic experiences of her own. The foreperson confirmed that Juror No. 5 had referenced her personal experiences but said that other jurors had objected that these experiences were not relevant. The trial court chose not to discharge Juror No. 5, and it denied Defendant's motion for a mistrial as well as his request to further investigate what Juror No. 5 told the panel.

The trial court then instructed the jury to start its deliberations over from the beginning so that the alternative juror could participate fully in the deliberations. The next day the jury found Defendant guilty on all counts.

## D. Sentencing

On August 14, 2023, the trial court sentenced Defendant to a total indeterminate sentence of 55 years to life on the convictions for sexual intercourse with, and oral copulation or sexual penetration of, a child 10 years or younger. The trial court also sentenced Defendant to a determinate term of seven years for the attempted aggravated sexual assault conviction.

Defendant filed a timely notice of appeal.

## II. DISCUSSION

Defendant challenges his convictions on two grounds: (1) there was insufficient evidence of force and duress to support his conviction for attempted aggravated sexual assault; and (2) the trial court failed to conduct an adequate investigation of juror misconduct. We consider each argument in turn.

4

## A. Attempted Aggravated Sexual Assault

Defendant was convicted of three offenses against a child 10 years or younger and one offense against a child under 14 years, attempted aggravated sexual assault. Defendant argues that the conviction for attempted aggravated sexual assault, which was based on attempted sodomy, was not supported by sufficient evidence.

In challenging the sufficiency of the evidence, Defendant " ' "bears a heavy burden." ' " (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.)  When we review sufficiency of the evidence, we examine whether there is " 'substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)  In so doing, we do not reweigh the evidence or reevaluate the credibility of witnesses.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  Instead, "we review the entire record in the light most favorable to the judgment" (*People v. Avila* (2009) 46 Cal.4th 680, 701), "resolving all evidentiary conflicts and questions of credibility in favor of the verdict, and indulging every reasonable inference the jury could draw from the evidence."  (*People v. Autry* (1995) 37 Cal.App.4th 341, 358.)  As a consequence, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient evidence to support" ' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Defendant has not satisfied this burden.  Although the prosecutor presented little evidence that Defendant attempted to commit sodomy by means of force, the prosecutor also argued that Defendant attempted to commit sodomy by means of duress, and we conclude that there is substantial evidence of duress.

### 1. Aggravated Sexual Assault

Under section 269, a person commits aggravated sexual assault by committing one of five listed offenses against child who is both less than 14 years old and seven or more years younger than the person.  (§ 269, subd. (a) ["Any person who commits any of the

following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child . . . ."].) One of the listed offenses is "[s]odomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286." (§ 269, subd. (a)(3).) Section 286 prohibits acts of sodomy against individuals under 18 years of age. (§ 286, subd. (b)(1).) In addition, subdivision (c)(2)(B) of the section imposes heightened penalties on any person who commits sodomy upon someone under 14 years of age "when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 286, subd. (c)(2)(B).) As it is undisputed that C.D. was only 12 or 13 years old at the time of the charged conduct, we examine whether there was substantial evidence that Defendant attempted to commit sodomy on C.D. "by means . . . of duress." (*Ibid.*)

### 2. Duress

Where duress is an element of an offense rather than an affirmative defense, courts have interpreted duress according to its ordinary meaning of a "direct or implied threat of force, violence, danger, hardship or retribution" sufficient to coerce a reasonable person into doing or permitting something the person otherwise would not. (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 49-50, fn. omitted (*Pitmon*) [interpreting duress under section 288 to mean "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted"]; see also CALCRIM Nos. 1015, 1030, 1045 (2024 ed.).)

In applying this standard, courts examine the "totality of the circumstances." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072 (*Thomas*).) Such circumstances include "the age of the victim, and his relationship to defendant" as well as any "disparity in physical size." (*Pitmon*, *supra*, 170 Cal.App.3d at p. 51; see also *Thomas*, *supra*, 15

6

Cal.App.5th at p. 1072 [also considering "threats to harm the victim," physical control if the victim attempts to resist, "warnings to the victim that revealing the molestation would result in jeopardizing the family," and "the relative physical vulnerability of the child"].) Additionally, in determining how a reasonable person would react to these circumstances, courts examine the response of a normal, average person of the victim's age. (*Pitmon*, *supra*, 170 Cal.App.3d at p. 51 [examining the "perspective of a normal, average eight-year-old"]; see also *People v. Soto* (2002) 51 Cal.4th 229, 246 ["[T]he legal definition of duress is objective in nature and not dependent on the response exhibited by a particular victim."].)

Children are vulnerable to psychological coercion by family members who exercise authority over them. (See *People v. Martinez* (2024) 105 Cal.App.5th 178, 190 (*Martinez*) ["Where a defendant occupies a father-figure role over a young child, multiple cases have found duress in situations lacking force, violence, or threats."].) Consequently, courts have recognized that, when a father or other close relative molests a child that is nine years old or younger, "in all the but the rarest cases duress will be present." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 15, 16, fn. 6 (*Cochran*); see also *Thomas, supra*, 15 Cal.App.5th at pp. 1072-1073 ["When the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases."]; *People v. Veale* (2008) 160 Cal.App.4th 40, 49 (*Veale*) [" '[A]s a factual matter, when the victim is as young as the victim is and is molested by her father in the family home, in all but the rarest cases duress will be present.' "].) In addition, some courts have stated that older children are less vulnerable to psychological coercion and held that duress cannot be found simply because a father abuses a child who is 12 years or older. (*People v. Espinoza* (2002) 95 Cal.App.4th 1287 1319-1322 (*Espinoza*) [child of 12 or 13]; *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1241, 1249-1251 (*Hecker*) [child or 12 or 13 old]].)

However, in assessing whether a child was under duress, courts look not only at the age of the victim when sexual abuse occurred, but also at the age when the abuse began and whether it continued. As courts repeatedly have recognized, " ' "continuous exploitation" ' " of a child by a person in a position of dominance " 'is relevant to the existence of duress.' " (*Martinez*, *supra*, 105 Cal.App.4th at p. 189; see also *People v. Hale* (2012) 204 Cal.App.4th 961, 979 [" 'Where the defendant is a family member and the victim is young . . . , the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress."]; see also *People v. Senior* (1992) 3 Cal.App.4th 765, 775 (*Senior*) [same]; *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 (*Schulz*) [same]; *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 239 ["courts also have looked to factors such as the position of dominance and authority of the defendant and his continuous exploitation of the victim in determining the existence of force or fear"].)

### 3. Analysis

There was substantial evidence of duress here.

Defendant was in a position to exercise both physical and psychological dominance over his daughter. Defendant is six foot five inches tall and 280 pounds. Although C.D. is now relatively tall, she did not reach that height at an unusually early age. Consequently, when C.D. was 12 or 13 years old, Defendant towered over her. As numerous courts have recognized, such a disparity in physical size contributes to a "sense of . . . relative physical vulnerability" and makes a child susceptible to intimidation and duress. (*Pitmon*, *supra*, 170 Cal.App.3d at p. 50; see also *Veale*, *supra*, 160 Cal.App.4th at p. 49 [" 'Duress can arise from . . . relative ages and sizes.' "]; *Cochran*, *supra*, 103 Cal.App.4th at pp. 15, 16 [noting size differential].)

Defendant also was in a position of psychological dominance. As C.D.'s father, Defendant occupied a "position of authority" and dominance. (*Veale*, *supra*, 160 Cal.App.4th at p. 49; see *Martinez*, *supra*, 105 Cal.App.5th at p. 190; *Cochrane, supra*,

103 Cal.App.4th at p. 15; *Senior*, *supra*, 3 Cal.App.4th at p. 775.) It is true that Defendant was divorced and that C.D.'s mother had primary custody over her. However, starting in 2008 and continuing for seven years Defendant had sole custody over C.D. every other weekend, and she expected to be abused every time she went to stay with him. In a practice that Defendant initiated, when alone with Defendant in his home, C.D. was frequently nude, and, when Defendant told C.D. not to tell anyone what he was doing to her, she followed those instructions for over 10 years. Thus, there was substantial evidence Defendant was in a position of authority and dominance over C.D.

During the sodomy attempt, Defendant exercised his physical and psychological dominance. Defendant told C.D. to get on the floor, and even though she had an idea of what he was planning to do to her, C.D. obeyed and got down onto her hands and knees. Indeed, when the prosecutor asked "[d]id you think that you could refuse to get on the floor," C.D. replied "[n]o." C.D. also added that she thought that, if she refused, Defendant might cry as he often had done. The jury could have inferred that the crying was part of Defendant's psychological manipulation, which made C.D. fear his emotional instability and the implicit threat of emotional hardship and even violence that disappointing him might create. (See *Veale*, *supra*, 160 Cal.App.5th at p. 47 [noting that, in the absence of an overt threat, "an implied threat sufficient to support a finding of duress" may be inferred from the circumstances].)

The inference that C.D. submitted to the attempted sodomy because of psychological pressure and an implied threat of emotional hardship or violence is bolstered by C.D.'s demeanor on the stand. (See *Kneip*, *supra*, 219 Cal.App.3d at p. 239 [noting that the "existence of duress" may be supported by "nuances of expression and body language accompanying [victims'] testimony"].) When she testified, C.D. was visibly nervous and brought a stress ball to keep herself from fidgeting. Nonetheless, she found it hard to testify about the details of what Defendant did to her. Indeed, at one point, the trial court noted that C.D. was "visibly shaking and has been through her

9

testimony."[2]  A reasonable jury could interpret C.D.'s nervousness and shaking in testifying about events that occurred more than a decade before as a physical manifestation of an earlier psychological disturbance and infer that she allowed her father to attempt sodomy on her out of fear of potential hardship, not just concern about hurting his feelings.

The inference that C.D. was under duress is also supported by the long history of abuse that C.D. suffered.  C.D. testified that Defendant began to molest her almost as soon she started to visit her and he began to exercise sole custody over her on weekends.  Because C.D. was only six or seven years old at the time, it may be presumed that she submitted to this abuse under duress.  As cases have long recognized, "[w]hen the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases."  (*Thomas*, *supra*, 15 Cal.App.5ht at pp. 1072-1073; see *Veale*, *supra*, 160 Cal.App.4th at pp. 43, 49 [applying presumption to six or seven year old]; *Cochran*, *supra*, 103 Cal.App.4th at p. 16, fn. 6 [nine-year-old victim].)  Moreover, this molestation continued regularly for years.  Indeed, when C.D. stayed with her father, she frequently went unclothed, and she was molested so frequently that she expected to be molested every time that she went to stay with her father and was in his custody.  As courts also have long recognized, the " ' "continuous exploitation the victim" ' " by a defendant in a " ' "position of dominance and authority" ' " is evidence of duress. (*Martinez*, *supra*, 105 Cal.App.5th at p. 189; see *Hale*, *supra*, 204 Cal.App.4th at pp. 979-980; *Veale*, *supra*, 160 Cal.App.4th at pp. 43, 47; *Senior*, *supra*, 3 Cal.App.4th at p. 775; *Schulz*, *supra*, 2 Cal.App.4th at p. 1005; *Kneip*, *supra*, 219 Cal.App.3d at p. 239.)

---

[2] While it would have been preferable for the district attorney to elicit testimony concerning C.D.'s physical reaction, as he did earlier concerning her nervousness, the trial court's observations concerning C.D.'s demeanor were limited to factual observations concerning her behavior and did not impermissibly suggest any conclusions that should be drawn from that behavior.

Based on the totality of the circumstances, including the physical and psychological dominance exercised by Defendant over his daughter, the continuous exploitation stretching back to when she was only six years old, and C.D.'s visible nervousness and shaking on the stand, a reasonable jury could have found that Defendant attempted sodomy on C.D. by means of duress.

In nonetheless contending that there was insufficient evidence of duress, Defendant argues that several factors present here—the parent-child relationship, difference in age, and difference in size—are frequently present in child sexual abuse cases and not sufficient by themselves to establish duress. While that may be true for isolated incidents beginning when a child is 12 years or older (see *Espinoza*, *supra*, 95 Cal.App.4th at pp. 1319-1321 [12-year-old victim]; *Hecker*, *supra*, 219 Cal.App.3d at p. 1249-1251 [12- or 13-year-old victim]), it is well-established that these factors—the parent-child relationship, the difference in age, and the difference in size—are probative of duress. (See, e.g., *Thomas*, *supra*, 15 Cal.App.4th at pp. 1072-1073; *Hale*, *supra*, 204 Cal.App.4th at p. 979: *Schulz*, *supra*, 2 Cal.App.4th at p. 1005; *Pitmon*, *supra*, 170 Cal.App.3d at p. 51.) Moreover, in determining whether a sexual offense was accomplished by means of duress, the trier of fact should examine the "totality of the circumstances" (*Martinez*, *supra*, 105 Cal.App.4th at p. 189; see *Thomas*, *supra*, 15 Cal.5th at p. 1072; *Veale*, *supra*, 160 Cal.App.4th at p. 46; *Pitmon*, *supra*, 170 Cal.App.3d at p. 51), and here those circumstances include additional factors—the long history of continuous exploitation and C.D.'s demeanor on the stand—also supporting the finding of duress. Defendant does not attempt to explain why these factors in combination are not sufficient to support a finding of duress.

Defendant also notes the absence of some factors found relevant in other cases. For example, Defendant notes that there was no express threat of retribution or hardship if C.D. refused to comply, and C.D. did not testify that she was afraid that Defendant would physically harm her. However, "[t]he fact that the victim testifies the defendant

11

did not use force or threats does not require a finding of no duress . . . ." (*Cochran*, *supra*, 103 Cal.App.4th at p. 14; see *Pitmon*, *supra*, 170 Cal.App.3d at pp. 47-48, 51 [finding duress despite victim's testimony that defendant did not threaten her].) Instead, a victim's denials "must be considered in light of her age and her relationship to the defendant." (*Cochran*, at p. 14.) Here, despite the absence of testimony about explicit threats, there is more than enough evidence in the record to support a finding of duress, especially in light of the long history of sexual abuse.

Defendant observes as well that C.D.'s parents were separated and therefore there was no threat here that C.D. would break up the family or jeopardize its security and well-being if she did not comply with Defendant's demands. While that is true, C.D.'s testimony showed a long history of continuous exploitation in which C.D. went unclothed whenever she was in Defendant's custody and also that she expected to be sexually molested each time that she stayed with him. While Defendant asserts that it is "illogical" to infer that she was vulnerable to psychological pressure because of her habitual abuse, for decades courts have recognized a victim's continuous exploitation suggests duress. (*Martinez*, *supra*, 105 Cal.App.5th at p. 189; *see Hale*, *supra*, 204 Cal.App.4th at pp. 979-980; *Veale*, *supra*, 160 Cal.App.4th at pp. 43, 47; *Senior*, *supra*, 3 Cal.App.4th at p. 775; *Schulz*, *supra*, 2 Cal.App.4th at p. 1005; *Kneip*, *supra*, 219 Cal.App.3d at p. 239.) While Defendant cites a twenty-year-old decision taking a different view (see *Espinoza*, *supra*, 95 Cal.App.4th at p. 1321), she offers no reason why we should reject the vast bulk of authority in favor of that decision, especially in light of the much more egregious facts in this case.

Accordingly, we conclude that there was substantial evidence of duress supporting Defendant's conviction for attempted aggravated sexual assault.

### B. Juror Misconduct

During trial, the trial court learned that a juror may have conducted an improper out-of-court investigation. In determining that the juror did so and excusing the juror, the

court learned that during deliberations another juror—Juror No. 5—had referred to her personal experience with sexual abuse as a child. Although the trial court investigated this issue as well, it did not dismiss Juror No. 5 and denied Defendant's subsequent motion for a mistrial.

Defendant now argues that the trial court should have conducted a more thorough investigation and, alternatively, that Juror No. 5 should have been excused based on the information that the court had. We review the trial court's decisions concerning both the investigation and remedying juror misconduct for abuse of discretion, accepting factual findings that are supported by substantial evidence but independently reviewing mixed questions of law and fact. (*People v. Weatherton* (2014) 59 Cal.4th 589, 598; *People v. Alexander* (2010) 49 Cal.4th 846, 927 (*Alexander*).) As explained below, we conclude that there was no abuse of discretion.

### 1. *The Misconduct Hearing*

On the second day of jury deliberations, the trial court received a note asking if would be improper for a juror to ask her children whether they remembered the address where they lived when they were younger, an issue raised by C.D.'s mistaken recollection of the address of the home where she lived before she was 10. The trial court then questioned the juror who wrote the note, Juror No. 5. According to Juror No. 5, in arguing that C.D.'s mistake was plausible, another juror (Juror No. 3) told the jury that she had asked her son whether he could remember his address when he was younger and he could not. Juror No. 5 said that she objected immediately that this information was inappropriate but there was disagreement among the jurors, and they decided to submit the question to the trial court.

The court then questioned the juror who had made the statement concerning her son. The juror admitted that she had asked her son whether he remembered where they had lived previously, that he mixed up the addresses, and that she related this exchange during the jury deliberations. The juror confirmed that Juror No. 5 objected, which

13

brought an end to the subject. Because the juror had violated instructions not to discuss the case with others or to conduct investigations, the trial court excused the juror.

The excused juror also told the court that she had "a problem with Juror Number 5 because she keeps referring to her personal experiences when we deliberate." After a sidebar with counsel, the trial court inquired into this issue, and the excused juror explained that Juror No. 5 was "very emotional about the experience she has [had] in her life" and kept "referring to her personal experience." Although Juror No. 5 "didn't share details about it," Juror No. 5 said that she had "some trauma" from "something [that] had happened when she was young." According to the excused juror, Juror No 5 also said that, in light of her experience, "it is supposed to look like this" or "she . . . should have done this." However, Juror No. 5 didn't tell the other jurors "exactly what happened" to her.

After conferring with counsel, the trial court questioned the foreperson. In addition to confirming that Juror No. 5 objected immediately after the excused juror talked about questioning of her son, the court asked about Juror No. 5's discussion of her personal experiences. The foreperson replied that Juror No. 5 had mentioned her personal experiences. Indeed, the foreperson noted that Juror No. 5 "was surprised that she was selected, based on the fact that she shared with us that she had experienced being sexually molested as a child." However, the foreperson noted that when Juror No. 5 had mentioned her personal experiences that day, the rest of the jury pushed back, said she was not supposed to talk about that, and asked her to stop. As a result, Juror No. 5's experiences "ha[d] not come up again." When asked what details about her personal experiences Juror No. 5 offered, the foreperson said "[b]asically that she was molested" and that "her experience was different than what she had heard in testimony." Others responded "that's your personal experience, but that's not the facts of the case."

After an alternate juror was sworn in to replace the excused juror, the trial court instructed the jurors to begin deliberations anew. Defense counsel then moved for

14

mistrial based on the conduct of both Juror No. 5 and the excused juror. In addition to arguing that the prejudice caused by the excused juror could not be cured, defense counsel argued that information shared by Juror No. 5 constituted improper probability evidence and improper expert testimony. Counsel also contended that the court should question each juror separately to learn what information Juror No. 5 shared with the jurors because there was a difference—which counsel did not identify—in the reports from the excused juror and the foreperson concerning what Juror No. 5 said. Counsel did not argue that Juror No. 5 was biased.

The trial court denied Defendant's request for a mistrial and did not conduct any further investigation. In so doing, the court explained that excusing the juror who conducted the experiment sufficiently cured that misconduct because there was not a lengthy discussion concerning the "investigation." The court did not explain its rulings concerning Juror No. 5.

### 2. *The Trial Court's Investigation*

Defendant argues that the trial court abused its discretion by not further investigating what Juror No. 5 said about her personal experiences to the jury and whether as a result of those experiences Juror No. 5 was biased against him. We disagree. In investigating potential misconduct during jury deliberations, trial courts are forced to strike a balance, and the balance struck by the trial court was reasonable.

" 'When a trial court is aware of possible juror misconduct, the court "must 'make whatever inquiry is reasonably necessary' " to resolve the matter.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 274, italics omitted.) In doing so, a trial court must balance conflicting considerations. On the one hand, the court must conduct an inquiry sufficient to determine whether any juror who engaged in misconduct should be discharged and whether the impartiality of other jurors was affected. (*People v. Fuiava* (2012) 53 Cal.4th 622, 702 (*Fuiava*); *People v. McNeal* (1979) 90 Cal.App.3d 830, 839.) On the other hand, any inquiry " 'should be as limited in scope as possible, to avoid intruding

15

unnecessarily upon the sanctity of the jury's deliberations.' " (*Alexander*, *supra*, 49 Cal.4th at p. 927.) The decision whether to conduct an investigation as well as " '[t]he specific procedures to follow investigating an allegation of juror misconduct are generally a matter for the trial court's discretion.' " (*People v Johnsen* (2021) 10 Cal.5th 1116, 1170; *Fuiava*, *supra*, 53 Cal.4th at p. 702.)

Defendant contends that there were differences in the testimony concerning what personal experiences Juror No. 5 disclosed to the panel and that Juror No. 5 should have been questioned about what she disclosed about her experiences. In fact, the testimony of the excused juror and that of the foreperson were quite similar. The excused juror testified that Juror No. 5 "keeps referring to her personal experiences," those experiences "happened when she was young," and they caused "a trauma," but Juror No. 5 did not reveal "exactly what happened." The foreperson testified similarly but provided more detail. According to the foreperson, both that day and the day before, Juror No. 5 had referenced her personal experiences and indicated that she had been sexually molested as a child. However, the foreperson said that the only details that Juror No. 5 shared were that she was molested and that her experiences differed from the testimony at trial. Moreover, the foreperson testified that there was no further testimony concerning Juror No. 5's personal experiences because the rest of the jury pushed back and said that they should not be discussing things that were not part of the case.

In short, both the excused juror and the foreperson testified that Juror No. 5 mentioned that she had traumatic experiences when she was young but had not disclosed any details about those experiences, Especially in light of the foreperson's testimony that the rest of the jury had pushed back against the references to Juror No. 5's personal experiences, the trial court reasonably concluded that no further inquiry into what Juror No. 5 said was needed.

Defendant also contends that Juror No. 5's statements about her personal experiences put the trial court on notice that, as a crime victim, her experiences may have

16

compromised her impartiality and that the court should have examined her for bias. As Defendant points out, when a trial court is on notice that there may be good cause to discharge a juror, it is required to conduct an inquiry into the issue. (See, e.g., *Fuiava*, *supra*, 53 Cal.4th at p. 702; *People v. Ledesma* (2006) 39 Cal.4th 641, 738.) However, trial courts normally determine whether former crime victims may set aside their personal experiences and operate as impartial jurors during voir dire. (Stds. Jud. Admin., § 4.30(b)(a)(16) [recommending that trial courts ask prospective jurors in criminal cases "[h]ave you . . . ever been the victim of any crime?"]; see also Judicial Council form Jury-002, § 1.31 [asking whether prospective jurors have ever been a victim of a crime, when, and what happened].)

Although the voir dire was not included in the reporter's transcript, it nonetheless appears that the trial court made such a determination: According to the foreperson, Juror No. 5 expressed surprise that she was selected for the jury even though she had been sexually molested at trial, which suggests that she was selected despite disclosing her prior experiences. As Defendant's trial counsel made no mention of actual bias in requesting further investigation, we must presume that the impact of Juror No. 5's prior experiences on her ability to be impartial was fully explored during voir dire, and the trial court reasonably concluded that the testimony concerning the jury deliberations did not warrant further inquiry. (See, e.g., *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 ["[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on the appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment."].)

### 3. *External Evidence and Expert Testimony*

Defendant also contends that, even without further investigation, the trial court should have discharged Juror No. 5 because the juror improperly injected external

17

evidence into the jury's deliberations and essentially attempted to provide expert testimony based on her personal experiences. These contentions are unfounded.

First, Juror No. 5 did not inject external evidence into the jury's deliberation. Although the excused juror testified that Juror No. 5 repeatedly referred to her personal experiences, the excused juror also said that Juror No. 5 "didn't share details about it" and other jurors "don't know exactly what happened." The foreperson similarly testified that, although Juror No. 5 said that she had been sexually molested, all that Juror No. 5 said was that her experiences differed from what the testimony in this case described. Moreover, far from asking for more details, other jurors told Juror No. 5 to stop talking about her experiences because "that's not the facts of the case." Consequently, far from injecting external evidence into the jury deliberations, Juror No. 5 merely made generalized references to her personal experiences, which is neither unusual nor improper. (See, e.g., *People v. Steele* (2002) 27 Cal.4th 1230, 1266 (*Steele*) ["[D]uring the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence."]; see also *People v. Fauber* (1992) 2 Cal.4th 792, 839 ["Jurors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room."].)

Second, contrary to Defendant's assertion, Juror No. 5 did not claim to have any specialized expertise or otherwise try to present an expert opinion. While "[j]urors' views of the evidence . . . are necessarily informed by their life experiences," a juror "should not discuss an opinion based explicitly on specialized information obtained from outside sources." (*In re Malone* (1996) 12 Cal.4th 935, 963.) Consequently, "[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' " which is misconduct." (*Steele*, *supra*, 27 Cal.4th at p. 1266.)

18

Juror No. 5 did not cross that line. Although Juror No. 5 mentioned that her experience with child sexual abuse differed from C.D.'s testimony, there is no evidence that she claimed any specialized knowledge or insight into child sexual abuse. To the contrary, as previously noted, the foreperson testified that when C.D. mentioned her personal experiences on the second day of deliberation, the other jurors pushed back and told her that she should not be talking about her experiences. Moreover, far from responding that her experiences gave her any special insight, Juror No. 5 acquiesced, and the issue did not come up again. In light of this testimony, the trial court properly rejected Defendant's contention that Juror No. 5 provided improper expert testimony.

### 4. *Actual Bias*

Defendant also argues that the trial court should have found that Juror No. 5 was actually biased because she was a crime victim and could not separate her personal experiences from C.D's experiences. We disagree. As the Supreme Court has admonished, " '[i]t is not required . . . that jurors be totally ignorant of the facts and issues involved" in a case.' " (*People v. Nesler* (1997) 16 Cal.4th 561, 580 (*Nesler*).) All that is required is that " 'the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " (*Id*. at pp. 580-581, italics omitted; see also *ibid.* ["An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial."].) Accordingly, crime victims may serve on juries in criminal cases as long as they are capable of setting aside their personal experiences. (See, e.g., *People v. Whalen* (2013) 56 Cal.4th 1, 51.) Indeed, even victims of childhood sexual abuse may serve as jurors in cases involving child sexual abuse. (*People v. Resendez* (1986) 260 Cal.App.2d 1, 10 ["Mrs. Robinson's remarks [about being sexually abused by her stepfather at age 15] did not disclose a biased or prejudiced mind against appellant . . . ."]; see also *People v. Kelly* (1986) 185 Cal.App.3d 118, 128 [following *Resendez* in holding that abuse as a child did not prevent juror from acting impartially].)

Of course, some prior victims may be unable to set aside their personal experiences and therefore may be excluded during voir dire for actual bias, and actual bias may be inferred if a juror conceals that he or she was the victim of a prior crime. (*Nesler*, *supra*, 16 Cal.4th at p. 581; *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929-930.) However, there is no suggestion that Juror No. 5 concealed that she was a childhood sexual abuse victim: To the contrary, as noted above, she appears to have disclosed the abuse during voir dire. Defendant notes that Juror No. 5 reportedly was "very emotional about the experience she has in her life." However, it does not follow that Juror No. 5 was biased and unable to render a verdict solely upon the evidence received at trial, especially in light of the voir dire and the failure of Defendant's trial counsel to express any doubt about Juror No. 5's impartiality. We therefore conclude that the trial court was not compelled to find Juror No. 5 actually biased.

### III. DISPOSITION

The judgment is affirmed.

20

_____
BROMBERG, J.

I CONCUR:


_____
GREENWOOD, P. J.

*People v. Christopher O.*
H051325

LIE, J., Concurring:

Like the majority, I consider the trial evidence sufficient to support defendant Christopher O.'s conviction for attempted aggravated sexual assault by sodomy of his daughter C.D., then 12 years old, by means of duress (Pen. Code, §§ 664, 269, 286, subd. (c)(2); count 4). With respect, however, I write separately because I would not conclude the evidence supports an inference that the defendant used any implied threat of violence as his means of duress. (Maj. opn., *ante*, at pp. 9–10.) Nor do I consider C.D.'s demeanor as a witness to be evidence that, eight years earlier, she feared any hardship if she did not comply with his attempt. (*Id*. at p. 10.) I would instead affirm on the ground that the evidence supports a conclusion that the defendant's emotional manipulation of C.D. was sufficiently coercive to overcome her will to resist the attempted sexual assault—given her age, the priority she placed on his well-being, and her years-long endurance of other forms of sexual abuse that he had normalized.

To be sure, C.D.'s age when the abuse began and her relationship with her father are highly relevant circumstances, and it has been said that "[w]hen the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072–1073.) Although this dictum in Thomas represents a prediction about the outcome of "[t]he totality of the circumstances" inquiry in most intrafamily abuse cases, it does not establish a presumption making age and parent-child relationship dispositive. (*Id*. at p. 1072; see also *People v. Veale* (2008) 160 Cal.App.4th 40, 49 [victim's age and relationship among the "various circumstances" relevant to duress].) So the features of the individual parent-child relationship and interaction remain relevant in the weighing of the circumstances, beyond the bare fact of that relationship and the age difference. (See, e.g., *Veale*, at pp. 44–45 [10-year-old witness feared that defendant stepfather would kill someone or hurt her or her mother]); *People v. Martinez* (2024) 105 Cal.App.5th 178, 190 [defendant "would tell [victim's] mother to discipline her if she acted out and her mother complied"

supporting "the inference that Martinez also could discipline Doe if she refused to acquiesce when he sexually abused her"]; *People v. Cochran* (2002) 103 Cal.App.4th 8, 15 (*Cochran*) [observing evidence of "father's parental and physical authority" in video showing defendant "respond[ing]" to victim's protestations of pain that "he is not hurting her, that he is not yet finished, [and] sometimes alter[ing] his [sexual] activity" rather than ceasing it], disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229 (*Soto*); *People v. Senior* (1992) 3 Cal.App.4th 765, 775, fn. omitted [defendant father "during the first molestation . . . threatened to hit her if she moved" and on other occasions "pull[ed] the victim back and physically controll[ed] her when she attempted, albeit ineffectually, to pull away"].) Here, there was no evidence that the defendant (and not solely C.D.'s mother) played any disciplinary role in C.D.'s upbringing, that he ever used express or implied threats of discipline in their relationship, or that he ever used force to overcome any resistance. So while the parent-child relationship is of course relevant, it does not itself substantiate a theory of duress here, either alone or in tandem only with C.D.'s age.

I also lack the majority's conviction that C.D.'s demeanor as a witness or the difficulty of testifying that she described supports an inference of an implied threat of violence. (Maj. opn., *ante*, at p. 10.) As the majority notes, "the legal definition of duress is objective in nature and not dependent on the response exhibited by a particular victim" (*Soto*, *supra*, 51 Cal.4th at p. 246), even though the offense of conviction requires that the abuse be "against the [particular] victim's will" (Pen. Code, § 286, subd. (c)(2)(B)). C.D.'s demeanor no doubt aided the jury in assessing the credibility of her testimony about the circumstances of the abuse and the effect of those circumstances. But demeanor does not compensate for an absence of testimony supporting an implied threat of violence. Nor does C.D.'s acknowledgment that it was difficult to testify and that she was nervous. She explained that the difficulty arose from being "ask[ed] more specific questions" in "a longer process" before "a lot of people," compared to her

2

experience initially confiding in her school guidance counselor. Even construed in the light most favorable to the judgment, C.D.'s demeanor and difficulty testifying do not amount to reasonable, solid or credible evidence that the defendant once used an implied threat of violence to overcome her will.

The evidence does, however, support a conclusion that C.D. acquiesced in her father's attempt at sodomy as the result of psychological coercion, which the defendant acknowledges does not require the actual or threatened use of physical force. The jury heard C.D.'s testimony that she was sensitive to her father's mood—she "didn't like seeing [her father] sad"—and that the defendant "in general" responded by crying, sometimes loudly. Although the implied threat of a purely emotional reaction might be inadequate to overcome the will of a reasonable adult or teenager, what may overcome a reasonable child's resistance to a parent's desires necessarily accounts for the parent-child relationship and the child's age. A child depends on parents for emotional support and protection, not just physical safety. As the defendant acknowledges, the harm threatened by duress may be an " 'implicit threat' " to familial "well-being." (See *Cochran*, *supra*, 103 Cal.App.4th at p. 16 [implicit threat that child's failure to comply may break up the family].) The jury here could infer from the evidence that C.D., by age 12, was at once old enough to anticipate her father's next emotional gambit (just as reliably as she understood that his telling her to get on her knees was preliminary to a new mode of sexual assault) and young enough that her father's display of despondency when they were alone together could be deeply unsettling. The jury could also infer from the evidence that C.D., as a child who was uncomfortable speaking, then lacked another means of assuaging a threatened paternal display of despondency, except by doing the defendant's bidding.

For these reasons, I respectfully concur in the judgment.

_____
LIE, J.

*People v. Christopher O.*
H051325